No. 68,564

SHANA NERO, *Appellant*, v. KANSAS STATE UNIVERSITY, *Appellee*.

(861 P.2d 768)

Opinion filed September 22, 1993.

*William Scott Hesse,* of Myers, Pottroff and Ball, of Manhattan, argued the cause, and *Jerry Kirksey* and *Roy S. Dickinson,* of Jerry Kirksey & Associates, of Edmond, Oklahoma, were with him on the brief for appellant.

*Jennifer M. Kassebaum,* associate university attorney, argued the cause, and *Dorothy L. Thompson,* associate university attorney, was on the brief for appellee.

The opinion was delivered by

ABBOTT, J.: Shana Nero appeals from the trial court's grant of summary judgment to Kansas State University (KSU). At issue is whether KSU has a duty to protect residents of university residence halls and, if so, the nature and extent of that duty.

Shana Nero was sexually assaulted in a coed residence hall by a fellow residence hall student, Ramon Davenport.

Thirty-five days earlier, Ramon Davenport resided in Moore Hall, a coed residence hall at KSU. On that date, April 28, 1990, Ramon Davenport was accused of raping J.N., a female resident of Moore Hall.

The following Monday, April 30, 1990, because of the accusation of rape against Davenport and after consultation between KSU housing and student life administrators and staff members, Davenport was assigned temporarily to Marlatt Hall, an all-male residence hall on the other side of the campus. The Assistant Director of Housing, Dr. Rosanne Priote, sent Davenport a letter dated April 30, 1990, confirming the temporary residence hall assignment and requesting he not enter Moore Hall or Derby Food Center until further notice in order to provide "some physical distance" between J.N. and Davenport. After meeting with Davenport, Dr. Susan M. Scott, Associate Dean of Student Life, in a letter dated May 2, 1990, confirmed Davenport's voluntary agreement to be reassigned to Marlatt Hall for the remainder of

the academic year. Dr. Scott also commented that because Davenport had agreed to the reassignment, KSU would not initiate immediately a university adjudication of the incident, but reserved the right to do so at a later date depending upon the outcome of the criminal charge. KSU does not have a set policy, practice, or procedure for removing from student housing a student accused of the rape or sexual assault of another student in a residence hall.

On May 2, 1990, Davenport was charged with rape in the Riley County District Court. He pleaded not guilty and was released on bond. The Manhattan Mercury and the Kansas State Collegian reported Davenport's arrest, the charge against him, his plea of not guilty, and his release on bond.

At the close of the 1989-90 academic year, only one residence hall, Goodnow Hall, was available for students attending intersession and summer school. Goodnow Hall was a coed residence hall.

Davenport moved into Goodnow Hall for the 1990 spring intersession, beginning May 18 and ending June 3. Shana Nero, a University of Oklahoma student, came to KSU for the intersession and was assigned to Goodnow Hall. Nero had two brief conversations with Davenport prior to June 2, 1990. She knew he was a KSU student living in the same residence hall.

On June 2, 1990, Nero was doing laundry and watching television in the basement recreation room of Goodnow Hall. Davenport came into the lounge and sexually assaulted her while the two of them were watching television.

On June 4, 1990, KSU terminated Davenport's summer school residence hall contract and instructed him to remove his belongings from Goodnow Hall by 8:00 p.m. that evening and not to enter any food service building or residence hall for any reason.

Nero brought a complaint against Davenport under KSU's Policy Prohibiting Sexual Violence, which had been adopted in 1989. Pursuant to Nero's complaint, Davenport was found to have violated the policy.

On August 29, 1990, Davenport pleaded guilty to the rape of J.N. In exchange for Davenport's plea on the rape charge, the sexual assault charge involving Nero was dropped.

Nero subsequently filed a negligence suit against KSU, alleging the university had a duty to protect her against Davenport's sexual advances and had failed to exercise reasonable care to do so. Nero also filed a claim of sexual assault and battery against Davenport. The trial court granted summary judgment against Davenport, and that judgment is not an issue in this appeal. The trial court granted KSU's motion for summary judgment. Nero appealed to the Court of Appeals. The case was transferred to this court, pursuant to K.S.A. 20-3018(c).

Nero claims the trial court erred in granting KSU's summary judgment motion because the court only partially analyzed whether KSU owed a duty of care to her. According to the plaintiff, KSU had a duty to protect her from Davenport's actions because of the university's "special relationship" with both Davenport and her and because she shared a landlord-tenant relationship with KSU.

"In a negligence action, summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact." *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 (1992).

The trial court, and this court on appeal, first must determine whether a duty exists. Without a duty, there can be no breach to support a plaintiff's claim. *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 297, 777 P.2d 839 (1989).

In *Thies v. Cooper*, 243 Kan. 149, 151, 753 P.2d 1280 (1988), this court recognized:

"It is the general rule that an actor has no duty to control the conduct of a third person to prevent that person from causing harm to others unless a 'special relationship' exists between the actor and the third party or the actor and the injured party. Restatement (Second) of Torts § 315 (1963)."

See *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991); *Washington v. State*, 17 Kan. App. 2d 518, Syl ¶ 1, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992).

As far back as 1983, this court, speaking through Justice McFarland, stated:

"Although this court has never formally adopted . . . § 315, . . . we discussed the concept of special relationship in *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458 (1982). . . . We observed a special relationship or specific duty has been found when one creates a foreseeable peril, not readily discoverable, and fails to warn. 231 Kan. at 364." *Durflinger v. Artiles,* 234 Kan. 484, 499, 673 P.2d 86 (1983).

The Restatement (Second) of Torts § 315 (1964), provides:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Comment c to § 315 explains:

"The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320."

"A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities, and persons with custody of another. Restatement (Second) of Torts §§ 316-320 (1964)." *McGee,* 248 Kan. at 438.

Although Nero never explicitly argued the distinctive nature of the university-student relationship imposed a duty of care upon KSU, our discussion commences with this argument because the converse view formed the basis of the trial court's grant of summary judgment in favor of KSU. The trial court ruled the university-student relationship in and of itself was not a special relationship within the meaning of § 315 and, upon that basis, refused to impose a duty upon KSU to protect Nero from Davenport's actions. The court reasoned that a plaintiff cannot predicate a university's liability on "the outmoded doctrine of in loco parentis" and that in general universities today "have no legal duty to shield their students from the dangerous activities of other students." Finding no Kansas cases on point, the trial court relied upon cases from other jurisdictions. See *Bradshaw v. Rawlings,* 612 F.2d 135 (3d Cir. 1979), *cert. denied* 446 U.S. 909 (1980);

*Tanja H. v. Regents of the University of California*, 228 Cal. App. 3d 434, 278 Cal. Rptr. 918 (1991); *Crow v. State of California*, 222 Cal. App. 3d 192, 271 Cal. Rptr. 349 (1990); *Baldwin v. Zoradi*, 123 Cal. App. 3d 275, 176 Cal. Rptr. 809 (1981); *Eiseman v. State of New York*, 70 N.Y.2d 175, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987). With regard to the doctrine of in loco parentis, the weight of authority is in agreement with the trial court's ruling. See *Furek v. University of Delaware*, 594 A.2d 506, 519-20 (Del. 1991). For a general discussion of the in loco parentis doctrine, see Szablewicz & Gibbs, *Colleges' Increasing Exposure to Liability: The New In Loco Parentis*, 16 J. L. & Educ. 453 (1987); Note, *The Doctrine of In Loco Parentis, Tort Liability and the Student-College Relationship*, 65 Ind. L.J. 471, 472 (1990).

The trial court found no Kansas cases that considered "whether colleges and universities have a duty to protect students living in their residence halls from sexual assaults by other students living in the halls" or "whether colleges and universities have a duty to warn other students when an individual living in its residence halls has been charged with sexual assault or any other crime." None of the cases the trial court cited are exactly on point, and all can be distinguished factually. The same can be said for the cases Nero cites.

*Bradshaw*, 612 F.2d 135, concerned whether a college could be held liable for injuries a student, Donald Bradshaw, sustained when riding in a car driven by a fellow student who had become intoxicated at the annual sophomore class picnic. A faculty sponsor helped plan the picnic and cosigned a check for class funds used to purchase the beer. The majority of students attending the picnic were under the legal drinking age of 21.

The Third Circuit rejected the in loco parentis doctrine, reasoning:

"Our beginning point is a recognition that the modern American college is not an insurer of the safety of its students. Whatever may have been its responsibility in an earlier era, the authoritarian role of today's college administrations has been notably diluted in recent decades. Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students. . . . College students today are no longer minors; they are now regarded as adults in almost every phase of community life. . . . There was a time when college administrators and

faculties assumed a role *in loco parentis*. Students were committed to their charge because, the students were considered minors. A special relationship was created between college and student that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the college. The campus revolutions of the late sixties and early seventies were a direct attack by the students on rigid controls by the colleges and were an all-pervasive affirmative demand for more student rights. . . . Regulation by the college of student life on and off campus has become limited. Adult students now demand and receive expanded rights of privacy in their college life including, for example, liberal, if not unlimited, [parietal] visiting hours. College administrators no longer control the broad arena of general morals. At one time, exercising their rights and duties *in loco parentis*, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives. Especially have they demanded and received satisfaction of their interest in self-assertion in both physical and mental activities, and have vindicated what may be called the interest in freedom of the individual will. . . .

"Thus, for the purposes of examining fundamental relationships that underlie tort liability, the competing interests of the student and of the institution of higher learning are much different today than they were in the past. At the risk of oversimplification, the change has occurred because society considers the modern college student an adult, not a child of tender years." 612 F.2d at 138-40.

The court acknowledged a special relationship could impose a duty upon the college. 612 F.2d at 141.

Bradshaw claimed the college's regulation that imposed sanctions on students who used alcohol created a custodial relationship between the college and its students. The Third Circuit disagreed, reasoning that the college's regulation simply "tracked" state law. Bradshaw's final argument was that because the college knew students would drink at the picnic in violation of state law and the college's regulation and because the college knew the students' conduct created a high risk of harm to third parties, the college had a duty either to control the students' conduct or to protect third parties, such as Bradshaw, from potential harm. The Third Circuit concluded that Bradshaw failed to prove either duty. The appellate court also noted it would be an impossible burden for the college to control students' beer drinking off campus, particularly in light of the fact the majority of the college's students were from a neighboring state in which the legal drinking age was 18. 612 F.2d at 141-42.

In *Baldwin*, 123 Cal. App. 3d 275, after a dorm party at which underage college students consumed alcohol in violation of state law and university policy, a high-speed car contest ensued that resulted in two or more of the cars colliding. The plaintiff, who was a passenger in one of the cars and was severely injured, sued the university. She claimed a special relationship existed between the university and herself that imposed a duty upon the university to prevent the injuries she received.

A California Court of Appeals panel noted: "When the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct, the common law as a general rule imposes liability only if the defendant bears some special relationship to the dangerous person or potential victim." 123 Cal. App. 3d at 282-83. The court commented that California has recognized "a duty of reasonable care when the defendant stood in a special relationship to both the victim and the person whose conduct created the danger." 123 Cal. App. 3d at 283. According to the court, foreseeability is central to determining whether a defendant owes a duty of reasonable care. The plaintiff had alleged in her complaint "that the negligent failure to prevent on-campus drinking on the date in question made it reasonably foreseeable that the students would follow the drinking by the driving of their cars in a negligent manner with plaintiff's resultant injuries." 123 Cal. App. 3d at 285-86.

"Foreseeability is stated to be a question of fact for the jury [citation omitted], but the matter does not end there. " '. . . [R]easonable foreseeability does not turn on whether the particular [defendant] as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected. . . ." ' [Citations omitted.] Even though a harm may be foreseeable, as it is alleged to be here, a concomitant duty to prevent the harm does not always follow. 'Rather, the question is whether the risk of harm is sufficiently high and the amount of activity needed to protect against harm sufficiently low to bring the duty into existence, . . .' [Citation omitted.]" 123 Cal. App. 3d at 286.

The Court of Appeals panel applied the following factors to determine whether a duty was owed to third persons:

" 'the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.' [Citation omitted.]" 123 Cal. App. 3d at 286.

The *Baldwin* court then concluded application of these factors to the facts of the case did not support establishing a duty and finding liability. The court noted "a lack of a close connection between the failure of the [university] to control on-campus drinking and the speed contest." 123 Cal. App. 3d at 287. With regard to the moral blame attached to the university's conduct, the court relied upon the *Bradshaw* court's discussion quoted above. In discussing community consequences, the *Baldwin* court commented:

"The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of post-secondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest." 123 Cal. App. 3d at 291.

In *Crow*, 222 Cal. App. 3d 192, the plaintiff attended a keg party at one of the residence halls on campus and was assaulted by a fellow student, who previously had assaulted a residence hall advisor while intoxicated. The plaintiff filed suit against the university, claiming the university failed to supervise the keg party adequately and failed to take action to prevent the assault against him. A California Court of Appeals panel noted that the common law " 'generally does not impose a duty upon a defendant to control the conduct of another, or to warn of such conduct, unless the defendant stands in some special relationship either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct.' [Citations omitted.]" 222 Cal. App. 3d at 208. The court then rejected the plaintiff's "claim of a university/student special relationship," relying upon the *Baldwin* court's discussion of the decline of the in loco parentis doctrine. 222 Cal. App. 3d at 208-09.

In *Tanja H.*, 228 Cal. App. 3d 434, a female university student was raped by four male students after a party in a residence hall in which students under the legal drinking age had been consuming alcohol. The university had regulations prohibiting the consumption of alcohol by underage students in the residence halls, and students signed statements agreeing to abide by those regulations. The female student filed suit against the four male students and the university.

After discussing *Baldwin* and *Crow*, a California Court of Appeals panel concluded the issue was the same as presented in those cases: "Should a duty be imposed which would make colleges liable for damages caused by third parties, unless colleges impose onerous conditions on the freedom and privacy of resident students—which restrictions are incompatible with a recognition that students are now generally responsible for their own actions and welfare?" 228 Cal. App. 3d at 438. The court noted "[a] university is not liable as an insurer for the crimes of its students" or "for the sometimes disastrous consequences which result from combining young students, alcohol, and dangerous or violent impulses." 228 Cal. App. 3d at 435, 437. It was reasoned that "courts have not been willing to require college administrators to reinstitute curfews, bed checks, dormitory searches, hall monitors, chaperons, and the other concomitant measures which would be necessary in order to suppress the use of intoxicants and protect students from each other." 228 Cal. App. 3d at 438. The Court of Appeals panel determined no duty should be imposed and concluded there was good reason not to shift moral and legal responsibility from the student perpetrators to universities. The court also rejected the plaintiff's premises liability theory, finding there was not a sufficient nexus between the lack of illumination in the stairway and the assault upon her. 228 Cal. App. 3d at 439.

In *Eiseman*, 70 N.Y.2d 175, Larry Campbell enrolled in a special state college program for the disadvantaged after being conditionally released from prison, and he subsequently raped and murdered a fellow student off campus. The New York Court of Appeals began its analysis by noting "the imposition of duty presents a question of law for the courts [citations omitted], resting on policy considerations of whether plaintiff's interests are

entitled to legal protection against defendant's conduct [citations omitted]." 70 N.Y.2d at 189-90. The court rejected the lower courts' view that the college's participation in the special program gave rise to a duty of heightened admissions inquiry or to restrict Campbell's campus activities. The Court of Appeals agreed with the lower courts' conclusion that liability cannot be based on the in loco parentis doctrine because "colleges today in general have no legal duty to shield their students from the dangerous activity of other students." 70 N.Y.2d at 190. The court concluded that to impose a duty of heightened admissions inquiry "would run counter to the legislative policy embodied by the [special] program as well as the laws and policies promoting the reintegration of former convicts into society." 70 N.Y.2d at 191. With regard to restricting Campbell's activities on campus, the highest court in New York commented: "Publicly branding him on campus as a former convict and former drug addict would have run up against the same laws and policies that prevented discriminating against him." 70 N.Y.2d at 191. The court then noted other students, including the victim, knew of Campbell's criminal record. The Court of Appeals reasoned that to impose liability upon the college "for failing to screen out or detect potential danger signals in Campbell would hold the college to a higher duty than society's experts in making such predictions—the correction and parole officers, who in the present case have been found to have acted without negligence." 70 N.Y.2d at 191.

Nero cites two cases in which courts have held that liability may be imposed upon a university based, at least in part, upon the distinctive university-student relationship. See *Furek v. University of Delaware*, 594 A.2d 506 (Del. 1991); *Mullins v. Pine Manor College*, 389 Mass. 47, 449 N.E.2d 331 (1983).

In *Furek*, a fraternity pledge was burned when a lye-based liquid oven cleaner was poured over his back and neck during a fraternity hazing activity. The pledge brought suit against the university and others. On appeal, the Supreme Court of Delaware considered whether the university-student relationship imposed a duty upon the university "to make and enforce policies which might protect the student from harm occasioned by the acts of third parties who function under the auspices of the university."

594 A.2d at 516. The court discussed the uniqueness of this relationship:

"While its primary function is to foster intellectual development through an academic curriculum, the institution is involved in all aspects of student life. Through its providing of food, housing, security, and a range of extra-curricular activities the modern university provides a setting in which every aspect of student life is, to some degree, university-guided. This attempt at control, however, is directed toward a group whose members are adults in the contemplation of law and thus free agents in many aspects of their lives and life styles." 594 A.2d at 516.

The *Furek* court was not convinced the university-student relationship did not impose at least a limited duty upon the university to protect students from their fellow students' actions. The court was critical of the policy analysis in *Bradshaw* and subsequent cases following *Bradshaw*, noting these cases provided "no empirical support for the proposition that supervision is inversely related to the maturation of college students." 594 A.2d at 518. The *Furek* court decided it was "equally reasonable to conclude that university supervision of potentially dangerous student activities is not fundamentally at odds with the nature of the parties' relationship, particularly if such supervision advances the health and safety of at least some students." 594 A.2d at 518. The court concluded:

"The university is not an insurer of the safety of its students nor a policeman of student morality, nonetheless, it has a duty to regulate and supervise foreseeable dangerous activities occurring on its property. That duty extends to the negligent or intentional activities of third persons. Because of the extensive freedom enjoyed by the modern university student, the duty of the university to regulate and supervise should be limited to those instances where it exercises control. Situations arising out of the ownership of land, within the contemplation of § 344, involving student invitees present on the property for the purposes permitted them are within such limitations." 594 A.2d at 522.

The *Furek* court also held the university had a duty to protect the student under a landowner-invitee analysis. 594 A.2d at 520-21.

In *Mullins*, 389 Mass. 47, after being raped by an unidentified assailant on the campus grounds, the plaintiff, a freshman, sued the college, which required all freshmen to live on campus. The Supreme Judicial Court of Massachusetts held that colleges owed

resident students a duty of protection against a third party's criminal acts, based upon two principles of law.

One principle was identified as " 'existing social values and customs,' " in that "colleges of ordinary prudence customarily exercise care to protect the well-being of their resident students, including seeking to protect them against the criminal acts of third parties." 389 Mass. at 51. The court concluded the "college community itself" recognized this duty in view of the fact that standards had been established setting forth the safety precautions a college should take. The court also reasoned that college campuses were breeding grounds for criminal behavior because of the number of young people, particularly young women, on these campuses and that colleges were in the best position to ensure their students' safety. The court acknowledged the decline of the in loco parentis doctrine, but maintained "[t]he fact that a college need not police the morals of its resident students, however, does not entitle it to abandon any effort to ensure their physical safety." 389 Mass. at 52. Furthermore, according to the court, colleges have helped to foster the expectation in students, parents, and the community at large "that reasonable care will be exercised to protect resident students from foreseeable harm." 389 Mass. at 52.

The *Mullins* court identified the second principle as the college's voluntary undertaking to protect students from the criminal acts of third persons and the students' reliance upon the college's undertaking. See Restatement (Second) of Torts § 323 (1964). According to the court, a student's "threshold" consideration in deciding which college to attend is the college's security measures. The court also noted that students pay for this service through tuition or dormitory fees. 389 Mass. at 53-54.

We hold the university-student relationship does not in and of itself impose a duty upon universities to protect students from the actions of fellow students or third parties. The in loco parentis doctrine is outmoded and inconsistent with the reality of contemporary collegiate life.

There are, however, other theories under which a university might be held liable. See, *e.g.*, Note, *The Liability and Responsibility of Institutions of Higher Education for the On-Campus Victimization of Students*, 16 J.C. & U.L. 119, 123-30 (1989).

See generally Bazyler, *The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Protect Patrons from Criminal Attack*, 21 Ariz. L. Rev. 727, 745 (1979); Browder, *The Taming of a Duty—The Tort Liability of Landlords*, 32 Def. L.J. 497, 500, 540-50 (1983); Selvin, *Landlord Tort Liability for Criminal Attacks on Tenants: Developments Since Kline*, 9 Real Estate L.J. 311 (1981); Note, *Expanding the Scope of the Implied Warranty of Habitability: A Landlord's Duty to Protect Tenants from Foreseeable Criminal Activity*, 33 Vand. L. Rev. 1493, 1503-07 (1980); Annot., 1 A.L.R.4th 1099 (discussion of a university's liability for failure to protect a student from crime); Annot., 43 A.L.R.3d 331, 348-53 (discussion of a landlord's duty to protect against crime).

Nero raises other theories. She initially claims the trial court erred in not addressing whether the evidence established a special relationship, other than one based upon the doctrine of in loco parentis, between KSU and Davenport or between KSU and herself.

The plaintiff focuses upon the relationship between KSU and Davenport. She claims KSU took charge of Davenport and was under a duty to exercise reasonable care to control him and prevent him from physically harming others because the university knew or should have known he was likely to cause such harm. The legal basis for her argument is Restatement (Second) of Torts § 315(a), 319 (1964).

Under § 315(a), a special relationship must exist between KSU and Davenport that imposes a duty upon KSU to control Davenport's conduct. See *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991); *Cansler v. State*, 234 Kan. 554, 560, 675 P.2d 57 (1984); *Washington v. State*, 17 Kan. App. 2d 518, Syl. ¶ 1, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992). Nero alleges that special relationship is based upon § 319, the duty of those in charge of a person having dangerous propensities. The fact that KSU changed Davenport's residence hall assignment, with his agreement, because of the rape accusation does not mean the university was "in charge" or "took charge" of Davenport within the meaning of § 319. This is exemplified by the illustrations following that section. One illustration involves a private hospital for contagious diseases permitting a patient who has infectious

scarlet fever to leave the hospital with the assurance he is recovered and the hospital negligently allowing another infectious patient to escape. The other illustration concerns a private sanitarium for the insane negligently allowing a homicidal maniac to escape.

Cases in which this court has applied § 319 typically have involved prisoners. See *Cansler*, 234 Kan. 554, Syl. ¶¶ 2, 3 (the State has a duty to confine inmates securely and, if inmates escape, to notify area residents and area law enforcement); *Washington*, 17 Kan. App. 2d 518, Syl. ¶ 2 ("Prison officials owe a duty of ordinary or reasonable care to safeguard a prisoner in their custody or control from attack by other prisoners."). *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993), involved the alleged assault and sexual molestation of a 12-year-old child by a 17-year-old bully, both of whom were in the custody of juvenile officials at the time of the alleged attack. SRS was aware of the older child's "history of violent and sexually deviant acts." 253 Kan. at 12. This court applied §§ 315, 319, and 321 of the Restatement, holding the State had a duty to warn the juvenile officials of the older child's propensity toward violence and to protect children who are taken into custody from others, including other children, in custody. In *Beck v. Kansas Adult Authority*, 241 Kan. 13, 735 P.2d 222 (1987), Bradley Boan, "a disturbed former prisoner . . . and a former mental patient," walked into the emergency room at the KU Medical Center and fired three shots, killing two people. This court held that the Medical Center did not have a common-law duty to warn because "the Medical Center did not take charge of Boan and did not have custody or control over him at any time after his release from the penitentiary or at the time he entered the Medical Center with shotgun in hand." 241 Kan. at 23. Here, KSU did not have the type of control or custody over Davenport contemplated by § 315.

The trial court found Nero's reliance upon *Cansler v. State*, 234 Kan. 554, misplaced in that "the duty of those in charge of persons with dangerous propensities has no application to the University residence hall setting." KSU urges this court to agree, stating the relationship between a university and its students is not analogous to the relationship between a prison and its inmates.

We believe the issue before us to be more basic. The trial court granted summary judgment. The law concerning the granting of summary judgment is well defined and has been stated in hundreds of cases; thus, we need not set it forth again. KSU is a landlord furnishing housing to its students in competition with private landlords. It owes a duty of reasonable care to its tenants. KSU has discretion whether to furnish housing to students. Once that discretionary decision is made, the university has a duty to use reasonable care to protect its tenants. Generally, whether a landlord has breached the duty of reasonable care to a tenant is a question of fact.

"Whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law. [Citation omitted.]" *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991).

"A proprietor of an inn, tavern, restaurant, or like business is liable for an assault upon a guest or patron by another guest or third party where the proprietor has reason to anticipate such an assault and fails to exercise reasonable care to forestall or prevent the same."

"The duty of a proprietor of a tavern or inn to protect his patrons from injury does not arise until the impending danger becomes apparent to him, or the circumstances are such that a careful and prudent person would be put on notice of the potential danger." *Gould v. Taco Bell*, 239 Kan. 564, Syl. ¶¶ 1, 3, 722 P.2d 511 (1986).

Other jurisdictions have applied the landowner-invitee analysis to determine whether a university has a duty to protect students from the criminal actions of third parties. See *Peterson v. San Francisco Community College Dist.*, 36 Cal. 3d 799, 205 Cal. Rptr. 842, 685 P.2d 1193 (1984); *Furek v. University of Delaware*, 594 A.2d 506, 520-21 (Del. 1991); *Relyea v. State*, 385 So. 2d 1378 (Fla. Dist. App. 1980), *disapproved on other grounds Avallone v. Bd. of County Com'rs Citrus Cty.*, 493 So. 2d 1002 (Fla. 1986); *Setrin v. Glassboro State College*, 136 N.J. Super. 329, 346 A.2d 102 (1975); *Brown v. N.C. Wesleyan College*, 65 N.C. App. 579, 309 S.E.2d 701 (1983). In analyzing the issue, all but the *Relyea* court relied upon Restatement (Second) of Torts § 344 (1964), which provides:

"A possessor ·of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

The general rule is that a landowner has no duty to protect an invitee on the landowner's premises from a third party's criminal attack unless the attack is reasonably foreseeable. Prior similar acts committed upon invitees furnish actual or constructive notice to a landowner. *Relyea*, 385 So. 2d at 1382-83. A university owes student tenants the same duty to exercise due care for their protection as a private landowner owes its tenants. See *Peterson*, 36 Cal. 3d at 807.

We emphasize that a university is not an insurer of the safety of its students. Nonetheless, a university has a duty of reasonable care to protect a student against certain dangers, including criminal actions against a student by another student or a third party if the criminal act is reasonably foreseeable and within the university's control.

Here, KSU knew of the alleged rape and had taken reasonable steps under the circumstances—*i.e.*, it removed Davenport from the coed dormitory and moved him across campus and into an all-male dormitory. The university requested that Davenport stay away from the coed dorm and the food service building. School was ending, and Davenport was allowed to finish the semester.

When Davenport enrolled for intersession, KSU had the option of refusing to rent space to him. Instead, the university placed him in a coed dorm with the plaintiff, who is from a different state and presumably had no knowledge of the pending rape charge against Davenport. Nero knew Davenport was a fellow student living in the same dormitory, which may have given her a false sense of security. She ended up alone with Davenport in a public area. Had Davenport been a stranger and not living in the same dormitory, Nero might have been more likely to protect herself by immediately leaving the area.

We are of the opinion reasonable people would disagree whether Davenport's attack on Nero was foreseeable. Thus, that issue must be resolved by the trier of facts, and the trial court erred in granting summary judgment.

KSU next argues it is immune from liability under the discretionary function exception to the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*

Under the KTCA, liability is the rule and immunity is the exception. The governmental entity has the burden of proving it is entitled to any of the exceptions enumerated in K.S.A. 1992 Supp. 75-6104. If KSU fails to meet this burden, the general rule of liability applies. See *C.J.W. v. State*, 253 Kan. 1, Syl. ¶ 6; *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. at 364. K.S.A. 75-6103(a) sets forth the general rule of liability:

> "Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

The discretionary function exception, upon which KSU relies, is found at K.S.A. 1992 Supp. 75-6104(e) and provides:

> "A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
>
> . . . .
>
> (e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."

In determining whether KSU's decision was within the discretionary function exception, our focus is on "the nature and quality of the discretion exercised." It is not enough that the governmental entity exercised its judgment. Some element of exercising judgment is involved in every case. The status of the employee exercising the discretion is not determinative. If there is a clearly defined mandatory duty or guideline, the discretionary function exception is not applicable. *Collins v. Board of Douglas County Comm'rs*, 249 Kan. 712, 721, 822 P.2d 1042 (1991); *Kansas State Bank & Tr. Co.*, 249 Kan. at 365.

Nero maintains the university's decision was ministerial based upon the deposition testimony of Dr. Pat Bosco, Associate Vice-President for Institutional Advancement. When asked who made the decision to move Davenport into Goodnow Hall, Dr. Bosco responded: "It would be our housing people, it would be purely an administrative move." He further explained that every year everyone attending summer school is consolidated into one residence hall and the other halls are closed. The plaintiff equates administrative with ministerial.

The parties disagree upon the proper time frame for determining if KSU is entitled to immunity. The plaintiff asks this court to focus upon only the university's decision to allow Davenport to reside in Goodnow Hall. KSU maintains we should examine the totality of its decisions after J.N. accused Davenport of rape. The university acknowledges "the closing of all but one residence hall and the consolidation of all intersession and summer school students in Goodnow Hall was indeed 'administrative,'" but argues "it had nothing to do with the University's response to [J.N.'s] accusation of rape against Ramon Davenport." The trial court focused upon the nature and quality of KSU's judgments after J.N. accused Davenport of rape.

In *Cansler v. State*, 234 Kan. 554, 570, 675 P.2d 57 (1984), we held the State had a duty (among other duties) to warn that a dangerous inmate had escaped. This court held the duty to warn is imposed by law and is ministerial, not discretionary. The issue of whether the State exercised reasonable care in doing so was held to be a question of fact.

In *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 731 P.2d 314 (1987), this court held the decision to undertake a voluntary or certain task is discretionary; however, once that decision is made, the State is not immune from liability under K.S.A. 75-6104(d) for negligence in carrying out a ministerial act in furtherance of the task. *Allen* is consistent with *Indian Towing Co. v. United States*, 350 U.S. 61, 100 L. Ed. 48, 76 S. Ct. 122 (1955), in which the United States Supreme Court held that whether to establish a lighthouse was discretionary but, once established, there was a duty to maintain it.

*Draskowich v. City of Kansas City*, 242 Kan. 734, 740-41, 750 P.2d 411 (1988), addressed the general duty under the KCTA to

maintain highways in a reasonably safe condition. This court determined that if the City of Kansas City knew there was ice on the road (not caused by the weather) making the road dangerous for vehicles to travel and failed to *warn* or take other steps reasonably necessary for the protection of those using the road, the question of negligence was an issue of fact to be determined by the trier of fact.

The discretionary function exception was reviewed in *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 757 P.2d 272 (1988). In *Dougan*, Chief Justice Prager, now retired, speaking for the court, said:

"Simply stated, our more recent cases hold that the discretionary function exception is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow. The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty.

. . . .

"In the later Kansas cases, the court has relied upon the presence or absence of a legal duty in deciding whether the discretionary function exception was applicable. *Beck v. Kansas Adult Authority*, 241 Kan. [13, 30, 33-34, 735 P.2d 222 (1987)]; *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 731 P.2d 314 (1987); and *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986). The language in *Allen* makes it clear that illegal acts are outside the scope of the discretionary function exception and that the negligent performance of a ministerial act is not within the exception.

. . . .

"Based upon the rationale set forth above, we have concluded that the trial court properly held in this case that the discretionary function exception provided for in K.S.A. 75-6104(d) does not apply to relieve the Rossville Drainage District from liability in this case. This is so because, under the Kansas Tort Claims Act, a governmental agency does not have a discretionary right to violate a legal duty and avoid liability. To so hold would completely nullify the purpose of the Kansas Tort Claims Act." 243 Kan. at 322-25.

We recently reaffirmed the above in *C.J.W. v. State*, 253 Kan. 1, Syl. ¶ 7, in which the court stated:

"The discretionary function exception to the Kansas Tort Claims Act, K.S.A. 1992 Supp. 75-6104(e), is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow. The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty."

We are satisfied the discretionary function exception to the Kansas Tort Claims Act does not apply in this case.

We conclude that KSU exercised its discretion to build, maintain, and operate housing units. Once that discretionary decision was made, KSU had a legal duty to use reasonable care under the circumstances in protecting the occupants of the coed housing unit from foreseeable criminal conduct while in a common area. A factual issue remains whether KSU used reasonable care in carrying out its legal duty to Shana Nero when it placed Ramon Davenport in a coed housing unit with her. A question also exists concerning a failure to warn her and a failure to institute adequate security measures to protect female students in the same housing unit based upon KSU's knowledge of the reported sexual attack by Ramon Davenport some three weeks earlier. Whether the second attack was foreseeable by KSU and whether KSU took adequate steps under the circumstances to prevent the second attack are questions of fact, and the trial court erred in granting summary judgment.

Reversed and remanded for trial.

Six, J., concurring and dissenting: I agree with the majority in rejecting the in loco parentis doctrine. The principals in the case at bar were adults. Nero was 20 years old and Davenport was 21. My departure from the majority relates to: (1) the imposition of a duty owing from KSU to Nero grounded on foreseeability and (2) the majority's analysis of the discretionary function exception to the KTCA, K.S.A. 1992 Supp. 75-6104(e). I would affirm the trial court.

The chronology of the on-campus events linking KSU, Davenport, and Nero in the spring-summer of 1990 is significant. (1) On April 28, 1990, a student, J.N. reported to law enforcement officers that Davenport had raped her in his room in Moore Hall, a coed residence hall, where both resided. (2) On April 30, 1990, Davenport was assigned temporarily to Marlott Hall, an all-male residence hall, in order to put distance between Davenport and J.N. (3) On May 2, 1990, Davenport was charged with rape in the district court. He entered a plea of not guilty, and his release on bond was continued by the court. (4) On May 2, 1990, the Associate Dean of Student Life, after meeting with Davenport,

reached an agreement that Davenport would be permanently assigned to Marlott Hall for the remainder of the academic year. The Dean explained that KSU would not instigate any university adjudication of the matter but that, pending disposition of the case in the criminal justice system, KSU might, at a future time, hold a judicial hearing. (5) J.N. did not invoke the university's policy prohibiting sexual violence and filed no complaint with KSU which would have triggered KSU's proceeding under its established sexual violence policy. (7) On April 29, 1990, May 3, 1990, and May 8, 1990, Davenport's arrest, the charges, his plea of not guilty, and his release on bond were reported in the local and campus newspapers (the Manhattan Mercury and the Kansas State Collegian). (8) The spring intersession commenced May 18, 1990, and ended June 3, 1990. Both Nero and Davenport enrolled. (9) Davenport moved into Goodnow Hall for the intersession. Goodnow Hall is coed and was the only student housing hall open for the intersession. Nero also lived in Goodnow Hall. (10) On June 2, 1990, Nero reported to the housing staff that Davenport, with whom she was acquainted, assaulted her while the two were watching TV in the Goodnow Hall lounge between 2:00 and 3:00 a.m. (11) On June 4, 1990, KSU determined that Davenport should be evicted from Goodnow Hall. (12) On August 29, 1990, Davenport changed his plea to guilty on the J.N. rape charge.

## Foreseeability

On June 2, 1990, Davenport was at liberty on a continuing bond and presumed innocent of the rape of J.N. Every defendant is entitled to the innocence presumption. *Coffin v. United States,* 156 U.S. 432, 453, 39 L. Ed. 481, 15 S. Ct. 394 (1895). See K.S.A. 21-3109 and PIK Crim. 2d 52.02 (1992 Supp.). The law should not require universities to confine or control students who only have been accused of crimes or to warn other students that a criminal charge or accusation is pending against a student living in one of the residence halls. KSU poses a rhetorical question: "Surely plaintiff is not suggesting that a picture or description of a student labeled 'rapist' should have been posted or circulated in Goodnow Hall." If Davenport was a person with dangerous propensities, the trial court undoubtedly would have imposed

more specific conditions of release to assure public safety. K.S.A. 1992 Supp. 22-2802(1) ("Any person charged with a crime shall . . . be ordered released . . . upon the execution of an appearance bond in an amount . . . sufficient *to assure the appearance of such person before the magistrate when ordered and to assure the public safety.*" (Emphasis added.) KSU did not have actual knowledge that Davenport raped J.N. until Davenport pled guilty to the rape charge two months after the attack upon Nero. The fact Davenport had been accused and charged with rape was not a valid basis for KSU administrators to conclude he would attack Nero or any other female resident. Davenport was entitled to a presumption of innocence until the rape charge against him was adjudicated. KSU, also, is entitled to acknowledge the presumption. The fact that KSU now knows Davenport raped J.N. does not mean that KSU knew or should have known either that Davenport raped J.N. at the time he accosted Nero or that Davenport was a person with dangerous propensities.

Nero claims that KSU took control of Davenport and, consequently, owed a duty to prevent him from harming others because KSU knew or should have known he was likely to cause harm. She advances the Restatement (Second) of Torts §§ 315(a), 319 (1964). I agree with the majority's conclusion that KSU did not have the control or custody over Davenport contemplated by § 315.

KSU did not "take charge" of Davenport by virtue of his residence in university housing. KSU should not be mandated to attribute dangerous propensities to Davenport based solely upon the rape accusation against him. KSU moved Davenport after J.N.'s allegation of rape in order to provide distance from J.N., who was living in the same student hall. Such action appears to me to be entirely reasonable.

Short of posting guards in the lounges, hallways, and bedrooms of the residence halls, KSU could hardly control the dynamics of the encounter that took place between Nero and Davenport. College students are legally regarded as adults. They expect a high level of privacy in their living arrangements, and there is little expectation of or tolerance for supervision of students living in modern-day university housing. Thus rests a continuing pre-

dicament for university administrators—a predicament compounded, in my view, by the majority opinion.

The majority references the landlord-tenant relationship, noting that KSU, as a landlord, owes a duty of reasonable care to its tenants and is in competition with private landlords. We have considered the student-university, landlord-tenant situation in *Burch v. University of Kansas*, 243 Kan. 238, 756 P.2d 431 (1988). In that case a grandmother came to visit at the granddaughter's student residence hall. The grandmother was directed by the main desk to a dark stairwell. She could not see, began feeling her way down the steps, fell, and injured her leg. The university police had to use flashlights to locate her. We extended traditional landlord-tenant premises liability concepts to the residence hall contract between the student and the university. The trial court had held that the contract did not create a landlord-tenant relationship. The question in *Burch* was whether the university owed the grandmother the duty of reasonable care to keep the stairwell reasonably safe for her protection or whether the university's only obligation was not to wantonly and recklessly injure her. 243 Kan. at 240. We reasoned that the duty of the landlord to exercise reasonable care in keeping a common area in a reasonably safe condition extends to persons expressly or impliedly invited by a tenant, including social guests of the tenant. 243 Kan. 238, Syl. ¶ 2. *Burch* is not a criminal conduct case.

We have recently considered, for the first time, the relationship between a business owner and patrons or customers when injury results from criminal acts of a third party. *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, Syl. ¶¶ 2, 3, 856 P.2d 1332 (1993). We stated:

"The owner of a business is not the insurer of the safety of its patrons or customers. The owner ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties in the business' parking lot, as the owner has no duty to provide security. Such a duty may arise, however, where circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken."

"The test for determining the foreseeability requirement for injuries to customers by the criminal acts of third parties occurring in a business' parking lot is determined to be the 'totality of the circumstances' rule as

opposed to the more restrictive 'prior similar incidents' rule, all as is more fully discussed in this opinion.

The majority, in the case at bar, imposes a duty on KSU because the sexual advances of Davenport on Nero may have been reasonably foreseeable and within the university's control. The opinion concludes that when Davenport enrolled for intersession, KSU had the option of refusing to rent space to him. On what basis? He was at that time presumed to be innocent of the incident involving J.N. The record reflects no other antisocial behavior on his part. Goodnow Hall was the only residence hall open for intersession. A refusal of student housing might well have triggered a claim against KSU by Davenport based on the student housing denial. The majority presumes that Nero had no knowledge of the pending rape charge against Davenport. I find no basis in the record for such a presumption. University administrators are now confronted with a Hobson's choice when dealing with students criminally charged who enter pleas of not guilty. Is the prudent administrator to assume such students are guilty until proven innocent?

There is no evidence in the record that suggests Davenport was not free to enter the TV lounge at Goodnow Hall regardless of whether he lived in that hall, another residence hall, or off campus. The fact that KSU had control of his dormitory assignment does not mean KSU could have prevented Davenport from attacking Nero in the Goodnow Hall lounge. KSU did not assign Davenport to a coed dormitory arbitrarily. Goodnow Hall was the only residence hall open during spring intersession. Nero does not allege Goodnow Hall lacked adequate security, such as guards or locked doors.

Davenport's June 2, 1990, sexual advances on Nero were, as a matter of law, not reasonably foreseeable. The imposition of a criminal charge against a student does not suggest that, during the pendency of the action, the student will engage in any similar act. A reasonable expectation would be that a student charged with a crime would take particular care as to future conduct.

*Burch* and *Seibert* may signal this court's imposition, in an appropriate future residence hall criminal act case, of a university landlord's duty under the *Seibert* "totality of the circumstances" test to provide tenant security. *Seibert* holds that a duty may

arise for a business owner "where circumstances exist from which the owner [landlord] could reasonably foresee that its customers [tenants] have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken." 253 Kan. 540, Syl. ¶ 3.

### The KTCA-Discretionary Function Exception

The majority reasons KSU's decision was ministerial based upon the deposition testimony of Dr. Pat Bosco, Associate Vice-President for Institutional Advancement. When asked who made the decision to move Davenport into Goodnow Hall, Dr. Bosco responded: "It would be our housing people, it would be purely an administrative move." He further explained that every year everyone attending summer school is consolidated into one residence hall and the other halls are closed.

We should examine the totality of KSU's decisions after J.N. accused Davenport of rape.

The trial court's findings examined the totality of the circumstances:

"Housing and Student Life administrators conferred over what to do. They were concerned about the welfare and comfort of [J.N.]. Acting on that concern, they moved Ramon Davenport out of Moore Hall and Derby Food Center until the end of the academic year so that the two would not come into contact. At the same time, Davenport had only been accused and pled not guilty. He did not enter his guilty plea until August 29, 1990. The University had no basis on which to make a judgment as to whether Ramon Davenport was guilty. [J.N.], his accuser, did not bring a complaint under the Policy Prohibiting Sexual Violence. Had she brought such a complaint under the adjudication procedures, the possible sanctions are themselves entirely discretionary. In short, University staff members had to decide among various interests. The University Housing Department and Student Life employees were called on to make decisions for which there existed no mandatory duty or guidelines."

Additionally, when Nero reported to the university officials that Davenport had sexually assaulted her, KSU evicted him from Goodnow Hall, the only residence hall available during intersession and summer school.

The majority's ruling that KSU was under a legal duty to act requires consideration of the university's conduct. A ministerial act is the performance of some duty involving no discretion. *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 322, 757 P.2d

272 (1988). Discretion is defined as the capacity to distinguish between what is right and wrong, lawful and unlawful, or wise or foolish sufficiently to render one amenable and responsible for his acts. *Dougan,* 243 Kan. at 323. The KSU policy decisions meet the *Dougan* definition of discretion. KSU's decision to move Davenport into Goodnow Hall involved discretion. KSU did not have to accept Davenport's housing application for intersession.

In *Haehn v. City of Hoisington,* 702 F. Supp. 1526 (D. Kan. 1988), the decision of the city manager on handling a female police officer's complaints concerning sexual harassment and assault and battery by another police officer were held to "clearly fall within the discretionary function exception at K.S.A. 75-6104(e)." 702 F. Supp. at 1532. The claim against the city manager was based on negligent supervision of the police staff. The court reasoned that the manager's handling of plaintiff's complaints about one of the officers "clearly entailed the formulation of governmental policy." 702 F. Supp. at 1533. The exception applied as a defense for the manager. The *Haehn* analysis is applicable to the case at bar.

The majority cites additional authorities in support of its position that the discretionary function exception does not apply because the actions of KSU were ministerial and not discretionary. I differ with the majority's analysis of the ministerial-discretionary relationship. In *Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984), we concluded that the State had not only failed in the enforcement of its statutory duty, but had also breached its common-law duties. 234 Kan. at 567-69. Cansler's claim was based upon the State's failing in its common-law duty to retain custody of known dangerous persons, giving them access to high-powered firearms, permitting them to escape confinement while well armed, and failing to warn the public and nearby on-duty law enforcement personnel, including Cansler, of an escape from prison. 234 Kan. at 569. The duty of the State to confine and to warn is imposed by law and is ministerial, not discretionary. 234 Kan. at 570. The legal duty of the Kansas State Penitentiary to confine prisoners and to warn of dangerous escapees is not applicable to the operation of KSU and its residence halls.

*Allen v. Kansas Dept. of S.R.S.,* 240 Kan. 620, 731 P.2d 314 (1987), involved the discretionary decision to undertake a purely

ministerial task of janitorial work. We reasoned that such an undertaking could not cloak the negligent performance of the ministerial act with immunity. We stated, "The actual cleanup of vomit on a floor is about as ministerial as an act can be." 240 Kan. at 623. The mechanics of mopping up a floor do not relate to the KSU-Davenport situation.

*Draskowich v. City of Kansas City,* 242 Kan. 734, 750 P.2d 411 (1988), is a street maintenance case. We noted that the issue in *Draskowich,* failure to warn of icy streets, was controlled by our line of cases recognizing that a city has an obligation to keep its streets in reasonably safe condition. Such a duty is mandatory. The duty was a common-law duty and no city had the right or discretion to avoid it. 242 Kan. at 739. We relied upon our earlier holding in *Toumberlin v. Haas,* 236 Kan. 138, 689 P.2d 808 (1984), that although statutory liability for defects in highways was repealed by the KTCA, a duty to maintain the highways remains under the general liability for negligence created by the Act. The scope of that duty is to be determined on a case-by-case basis. 242 Kan. at 740. Street maintenance cases are not persuasive in analyzing the KSU-Davenport-Nero relationship.

The majority suggests that *Allen* is consistent with *Indian Towing Co. v. United States,* 350 U.S. 61, 100 L.Ed. 48, 76 S.Ct. 122 (1955), *Indian Towing* is cited for the proposition that the decision whether to establish a lighthouse was discretionary but, once the lighthouse was established, there was a duty to maintain it. *Indian Towing* is not a discretionary function case. I suggest the majority's reliance is misplaced. Twenty-nine years after *Indian Towing,* in *United States v. Varig Airlines,* 467 U.S. 797, 812, 81 L. Ed. 2d 660, 104 S. Ct. 2755, *reh. denied* 468 U.S. 1226 (1984), the Court commented:

"The plaintiffs contended that the Coast Guard had been negligent in inspecting, maintaining, and repairing the light. Significantly, the Government *conceded* that the discretionary function exception was not implicated in *Indian Towing,* arguing instead that the Act contained an implied exception from liability for 'uniquely governmental functions.' *Id.,* at 64. The Court rejected the Government's assertion, reasoning that it would 'push the courts into the "non-governmental"-"governmental" quagmire that has long plagued the law of municipal corporations.' *Id.,* at 65."

In *Varig Airlines,* a consolidated case, plaintiffs alleged negligence in the FAA's failure to check specific items in the course

of certifying particular aircraft for use in commercial flight. In one of the cases, a jet airliner's lavatory trash receptacle allegedly did not meet applicable safety regulations, leading to an on-board fire that killed most of the passengers. In the other case, an airplane's gasoline-burning cabin heater was held not to have been in compliance with federal regulations. The Court found both suits barred by the discretionary function exception. The Court stated: (1) It is the nature of the allegedly tortious conduct, not the status of the actor who engages in the conduct, that determines the exception's relevance; (2) the exception clearly covers the government's discretionary acts in regulating the conduct of private parties; (3) the FAA's implementation of a mechanism, such as spot checks, to enforce compliance with its regulations is a discretionary decision and thus within the exception; and (4) the acts of FAA employees in executing the spot checks are also within the exception since those employees are "specifically empowered to make policy judgments" in administering the program. 467 U.S. at 813-20.

The Fourth Circuit has commented on the discretionary function exception and *Indian Towing* in the recent case of *Baum v. U.S.*, 986 F.2d 716, 723 (4th Cir. 1993):

"Because the government conceded that the maintenance of the lighthouse did not fall within the discretionary function exception, the opinion of the Court does not discuss that aspect of the FTCA. . . . For this reason, subsequent decisions of the Court have all but disavowed *Indian Towing* as authority relevant to the discretionary function exception, and we likewise find it inapplicable to the instant case. See *Varig Airlines*, 467 U.S. at 812, 104 S. Ct. at 2763-64; *Gaubert*, 499 U.S. 314, 322-23, 111 S. Ct. at 1273-74."

In *Baum* a driver and passenger of a vehicle that penetrated a guardrail on a National Park Service parkway brought an action for damages against the government under the Federal Tort Claims Act. *Baum* held that: (1) the choice of materials used in construction of parkway guardrails in a claim for negligent construction and design was a planning level decision that was protected by the discretionary function exception, and (2) the decision regarding replacement of guardrails in a claim for negligent repair was also protected by the discretionary function exception. 986 F.2d at 722-24.

Federal cases that have appeared after *Varig Airlines* are enlightening in the interpretation of the troublesome issue of identifying a discretionary function. See Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act: Time for Reconsideration*, 42 Okla. L. Rev. 459, 477 (1989).

"Many cases have involved decisions that arguably entail only the execution of programs or implementation of regulations. Thus, one court held the exception extends not only to broad policy decisions regarding the admission or release of Cuban refugees in general, but also to the 'operational decision' to allow a particular Cuban refugee, known to be a felon convicted of a violent crime, to enter the United States. [*Flammia v. United States*, 739 F.2d 202 (5th Cir. 1984).] The selection and supervision of participants in the federal witness protection program, [*Jet Industries, Inc. v. United States*, 777 F.2d 303 (5th Cir. 1985), cert. denied 476 U.S. 1115 (1986),] the use of and control over an informant in a Veterans Administration investigation of illegal drugs sales, [*Pooler v. United States*, 787 F.2d 868 (3d Cir.), *cert. denied* 479 U.S. 849 (1986),] and the failure of government inspectors to warn workers on inspected premises of dangers to which they were being exposed [see *Merklin v. United States*, 788 F.2d 172 (3d Cir. 1986),] have all been held by post-*Varig* courts to be within the exception. Failure to make adequate inspections of facilities on which federal funds are spent has been held immune, [*Pennbank v. United States*, 779 F.2d 175 (3d Cir. 1985),] as has the negligent performance of inspections that did take place. [*Hylin v. United States*, 755 F.2d 551 (7th Cir. 1985).] Even such mundane determinations as the decision not to post a lifeguard at a developed swimming site in a national forest [*Wysinger v. United States*, 784 F.2d 1252 (5th Cir. 1986),] and the Postal Service's decision to sell a used Jeep without warning the buyer of the vehicle's propensity to overturn [*Ford v. American Motors Corp.*, 770 F.2d 465 (5th Cir. 1985),] have been held discretionary functions. The same is true of negligence of the National Weather Service in predicting weather and tidal conditions. [*Spencer v. New Orleans Levee Bd.*, 737 F.2d 435 (5th Cir. 1984).]"

Some judgment is involved in any action or inaction. What is the nature and quality of the discretion exercised? *Robertson v. City of Topeka*, 231 Kan. 358, 362, 644 P.2d 458 (1982). In the case at bar, policy decisions were present in temporarily moving Davenport to Marlott Hall, in permanently assigning him there, in accepting his application to Goodnow Hall, in establishing a spring intersession, and in deciding that only one residence hall would be available during the intersession and that this one residence hall would be Goodnow Hall and coed. The relationship between KSU and Davenport involved the types of university

administration policy decisions that the legislature intended to put beyond judicial review.

McFARLAND, J., concurring and dissenting: I join in the concurring and dissenting opinion of Justice Six.

I am concerned that the majority is placing an unreasonable and legally unjustified burden on the defendant Kansas State University and all other Kansas colleges and universities which provide housing to their students.

J.N. accused Ramon Davenport of having raped her on April 28, 1990. The incident allegedly occurred in the middle of the night in Davenport's room at the coed residence hall in which they each resided. There is nothing to indicate that J.N. was forced to enter Davenport's room. Presumably, then, they were well acquainted at the time of the incident. Criminal charges were filed. The University responded by separating J.N. and Davenport—moving Davenport, with his agreement, to another residence hall housing only male students. When only one residence hall was available for the period of the intersession, Davenport was moved into the coed facility where the incident involving Nero occurred in the lounge area.

As the majority points out, the days of strict monitoring by a coed university of the private lives of its students is over. College students are to be treated as adults. When faced with a decision as to what to do when one student alleges sexual improprieties by a fellow resident, a university has a judgment call to make. Such a call has to be made on a case-by-case basis. The alleged impropriety herein was the subject of a criminal charge which, practically speaking, eliminates any meaningful due process proceeding by the University until after resolution of the criminal charge. It is unlikely the defense attorney would permit his or her client to tell the client's version of the events in a due process proceeding prior to resolution of the criminal charge. Yet, the University has entered into a contract with the accused resident to provide housing and cannot act arbitrarily. Thus, the University is placed in a very difficult situation.

The majority opinion would have the University warn fellow students of Davenport's potential risk to them. How is this to be done? Word of mouth? Publication in the student newspaper?

Flyers? Requiring Davenport to wear sandwich boards stating, "I am a rapist, beware"? Branding his forehead with the word, "Rapist"? In this country, an accused person is presumed innocent. The majority opinion, in essence, requires the University to presume guilt, treat the accused as a pariah, and ostracize him from all female students.

The University separated the living quarters of Davenport and J.N. The incident between those two arose out of their personal relationship. The University really had nothing on which to base a conclusion that Davenport was a risk to other female students and should not be domiciled with them. The majority would place a legal duty on the University to make a particular decision—that is, not to house Davenport with female students without warning them that Davenport was a threat to their safety. I disagree. The situation confronting the University was a complex one with no available solution so obvious and clear cut as to render it ministerial in nature. The University had a difficult judgment call to make. It made that call. The call proved, through the wisdom of hindsight, not to be a wise one. However, such a judgment call is a discretionary function specifically excluded from liability by the Kansas Tort Claims Act (K.S.A. 1992 Supp. 75-6104[e]).

I would affirm the district court.