Nos. 114,705
114,707

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROCHELLE PATTERSON, Mother and Next Best Friend of
NICOLETTE PATTERSON, a Minor, and GAVIN PATTERSON, a Minor,
*Appellant*,

v.

COWLEY COUNTY, KANSAS, KANSAS DEPARTMENT OF WILDLIFE, PARKS AND TOURISM,
and BOLTON TOWNSHIP, (ELAINE SELENKE as Heir-at-Law
of CORTNEY BREWER, Deceased),
*Appellees*.

SYLLABUS BY THE COURT

1.

The standard of review relating to summary judgment is discussed and applied.

2.

The Kansas Tort Claims Act allows individuals to bring claims against governmental entities for the negligent or wrongful acts of their employees. Government liability is the rule and immunity the exception.

3.

In a negligence action, a plaintiff carries the burden of proving duty, breach, causation, and damages. Whether a legal duty exists is a question of law for the court rather than a fact issue for the jury.

1

4.

K.S.A. 8-2003 requires the secretary of transportation to adopt a manual and specifications for a uniform system of traffic-control devices within the state. Pursuant to this statute, the secretary adopted the Manual on Uniform Traffic Control Devices.

5.

K.S.A. 8-2004 imposes a duty on the secretary to place and maintain traffic-control devices as deemed necessary in accordance with the Manual on Uniform Traffic Control Devices and its specifications.

6.

K.S.A. 2015 Supp. 8-2005 imposes a duty on local authorities to place and maintain traffic-control devices as deemed necessary in accordance with the Manual on Uniform Traffic Control Devices and its specifications.

7.

Responsibility for the placement and maintenance of traffic control devices and signs under the Manual on Uniform Traffic Control Devices rests with the public agency having jurisdiction over the particular roadway.

8.

Responsibility for the placement and maintenance of traffic control devices under the Manual on Uniform Traffic Control Devices does not require the public agency to conduct an engineering study on every road within its territorial borders for purposes of considering placement of a warning sign.

9.

The Kansas Tort Claims Act provides an exception to liability for governmental entities and employees engaged in the exercise or performance or the failure to exercise

or perform a discretionary function or duty and a more specific exception relating to placement and removal of traffic or road signs, signals or warning devices when such placement or removal is the result of a discretionary act of the governmental entity.

10.

Because it reflects a clear and consistent characterization of the analytical framework currently being used by Kansas courts on the issue, it is pragmatic to utilize the two-part test articulated in *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), as refined by *United States v. Gaubert*, 499 U.S. 315, 323, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991), to determine whether immunity attaches to discretionary functions.

11.

Under the first part of the *Berkovitz-Gaubert* test, courts must ascertain the precise governmental conduct at issue and consider whether that conduct was discretionary, meaning whether it involved an element of individual judgment or choice. Under the second part of the test, courts must consider whether the decision in question is one requiring the exercise of judgment based on considerations of public policy.

12.

The Kansas Tort Claims Act provides an exception to liability for governmental entities and employees against any claim for injuries resulting from the use of any public property intended or permitted to be used as a park, playground or open area for recreational purposes, unless the governmental entity or employee thereof is guilty of gross and wanton negligence proximately causing such injury.

13.

The Kansas Tort Claims Act provides an exception to liability for governmental entities or an employee acting within the scope of the employee's employment against

3

any claim for damages resulting from the failure to make an inspection, or making an inadequate or negligent inspection, of any property other than the property of the governmental entity, to determine whether the property complies with or violates any law or rule and regulation or contains a hazard to public health or safety.

14.

The Bolton Township is not a "local authority," as defined in K.S.A. 8-1432, and therefore lacks authority under K.S.A. 2015 Supp. 8-2005(a) to place traffic control devices on its roads. Moreover, the Bolton Township is not located within one of the five counties listed in K.S.A. 2015 Supp. 8-2005(c) and K.S.A. 2015 Supp. 68-526(b) that specifically grants this authority to townships.

Appeal from Cowley District Court; NICHOLAS M. ST. PETER, judge. Opinion filed January 27, 2017. Affirmed in part, reversed in part, and remanded with directions.

*Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant.

*Charles E. Millsap* and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee Cowley County, Kansas.

*Edward L. Keeley*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, for appellee Bolton Township.

*Donald A. McKinney*, of Wichita, for appellee Elaine Selenke.

Before MALONE, C.J., STANDRIDGE, J., and HEBERT, S.J.

STANDRIDGE, J.:  This interlocutory appeal arises out of wrongful death actions brought by the heirs (the plaintiffs) of two individuals who were killed in a single-vehicle accident on a road that dead ends at the banks of the Arkansas River. The plaintiffs filed

4

wrongful death claims against Cowley County, Bolton Township, and the Kansas Department of Wildlife, Parks and Tourism for failure to provide adequate warnings, signs, or barriers on certain portions of the road where the fatal accident occurred. The district court granted partial summary judgment to the County and granted summary judgment in full to the Township and the Kansas Department of Wildlife. We granted applications for interlocutory appeal by one of the plaintiffs and by the County on issues of duty and jurisdiction. As set forth more specifically below, we find the County had no duty to initiate an engineering study, the County is immune from liability under the discretionary judgment exception of the Kansas Tort Claims Act (KTCA) for any failure to place an advisory speed plaque or warning signs on its portion of 322nd Road, the County is not immune from liability under the recreational exception of the KTCA for any failure to place an advisory speed plaque, a Dead End sign, or a No Outlet sign on its portion of 322nd Road, the Township had no duty to place traffic control devices or other warning signs on its portion of 322nd Road, and the failure to inspect property of another exception to liability set forth in the KTCA does not apply to the facts presented in this case.

FACTS

The facts relevant to this appeal are generally undisputed. An east-west road known as 322nd Road runs just north of the Kansas-Oklahoma border in southern Cowley County, Kansas. The majority of 322nd Road is a paved county road maintained by the County, while the remaining approximately 1/4-mile east portion of the road is not paved and is located within the Township. The only regulatory or warning sign posted on the relevant portion of 322nd Road under the County's jurisdiction is a Pavement Ends sign located approximately 600 feet prior to the end of the pavement. The County has never maintained the unpaved portion of 322nd Road. The Township, believing that the entire road belonged to the County, has never maintained any portion of the road, paved or unpaved. Approximately 1/4-mile east of where the pavement ends, 322nd Road

5

comes to a dead end at the banks of the Arkansas River. The spot where the road ends is located in the Kaw Wildlife Area. The Kaw Wildlife Area is operated by the Kansas Department of Wildlife, which leases the land from the United States Department of the Army. The Kaw Wildlife Area is open to the public for use as a recreation area.

On November 19, 2010, a sport utility vehicle (SUV) occupied by Jason Patterson and Cortney Brewer traveled east on 322nd Road. There is some dispute over who was driving the SUV but that issue is not relevant to this appeal. Both Jason and Cortney had a blood-alcohol content over the legal driving limit of .08%. The SUV drove into the Kaw Wildlife Area while traveling at a speed of 10-12 miles per hour and began to brake just prior to reaching the river. The SUV's right front tire went over the edge of the river bank, causing the SUV to flip end-over-end and drop approximately 12 feet into the river. Both Jason and Cortney drowned as a result.

On June 12, 2012, Rochelle Patterson (Patterson), on behalf of two of Jason's surviving minor children, filed a wrongful death action against the County, the Township, and the Kansas Department of Wildlife. The petition alleged that the defendants had been negligent by failing to provide adequate warnings, signs, or barriers indicating that 322nd Road ended at the river and that this alleged negligence resulted in Jason's death.

On November 19, 2012, Elaine Selenke, Cortney's mother and representative of her estate, filed a wrongful death action against the County, the Township, and the Kansas Department of Wildlife, alleging that the defendants had negligently failed to place warnings, signs, or barriers to warn motorists that 322nd Road ended at the river, which caused or contributed to Cortney's death. Selenke later brought an essentially identical action against only the County and the Township.

The district court consolidated all three cases for purposes of discovery but deferred making a decision about whether the cases would be consolidated for trial. All

6

the parties filed motions seeking total or partial summary judgment and extensive briefs in response. For purposes of this appeal, it is only necessary to discuss specific issues that are related to each individual defendant. The County sought summary judgment on grounds that (1) it had no duty to erect warning signs on the portion of 322nd Road under the Township's jurisdiction and (2) it was immune from suit for failing to erect warning signs based on exceptions to liability in the KTCA for discretionary functions, recreational use, and failure to inspect property as set forth in K.S.A. 2015 Supp. 75-6104(e), (h), (k) and (o). The Township sought summary judgment on grounds that (1) it had no duty to place traffic control devices or other warning signs on any portion of 322nd Road and (2) it was immune from suit for failing to erect warning signs based on the exception to liability for recreational use under the KTCA, K.S.A. 2015 Supp. 75-6104(o), and the Recreational Use Act, K.S.A. 58-3201 *et seq.* The Kansas Department of Wildlife sought summary judgment on grounds that (1) it had no duty to place traffic control devices or other warning signs on any portion of 322nd Road, (2) it was immune from suit for failing to erect warning signs based on the exception to liability for recreational use under the KTCA, K.S.A. 2015 Supp. 75-6104(o), and the Recreational Use Act, K.S.A. 58-3201 *et seq.*, and (3) the plaintiffs' claims were barred by K.S.A. 60-513(b), the 10-year statute of repose.

After hearing argument on the motions, the district court filed a lengthy journal entry (1) granting summary judgment in part to the County because it was immune from liability under the discretionary judgment exception to the KTCA; (2) granting summary judgment in full to the Township because it had no duty to place traffic control devices on 322nd Road; and (3) granting summary judgment in full to the Kansas Department of Wildlife because it had no duty to place traffic control devices on 322nd Road, it was immune from liability under the recreational exception to the KTCA, and the plaintiffs' claims were barred by K.S.A. 60-513(b). In its ruling, the district court identified several material facts in dispute, including whether 322nd Road physically exists all the way to the edge of the river and whether an obvious hazard exists at the location where 322nd

7

Road enters the river that would not be evident to a motorist, especially at night. The court concluded its opinion by acknowledging there existed a "substantial ground for difference of opinion on the issue of duty and jurisdiction. . . . Therefore, the Court finds that this court's decision on the issue of jurisdiction and duty of 322nd Road, as well as other rulings as the court deems necessary to the resolution of these issues, should be determined by the Appellate Court, pending further disposition of the case."

After the district court issued its opinion, Patterson and the County each filed an application for interlocutory appeal with this court, which we accepted. The district court entered an order staying the proceedings below pending this court's review. We consolidated the cases for purposes of this appeal. Patterson was designated as the appellant, the County was designated as an appellee and the cross-appellant, and the Township and the Kansas Department of Wildlife were designated as appellees. Because Selenke did not appeal from any of the district court's rulings, she was designated only as an appellee and a cross-appellee. Finally, we note Patterson did not appeal from the district court's decision to grant summary judgment in favor of the Kansas Department of Wildlife.

## STANDARD OF REVIEW

The standard of review on summary judgment is well established:

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive

8

issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]'" *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 358-59, 352 P.3d 1032 (2015) (quoting *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 [2009]).

When there is no factual dispute, appellate review of an order granting summary judgment is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). To the extent we are required to interpret statutes in resolving this appeal, it involves a question of law over which we also have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

ANALYSIS

The parties present four points of error on appeal. First, Patterson asserts the district court erred in finding the County did not have a duty to initiate an engineering study to determine if the Manual on Uniform Traffic Control Devices (MUTCD) required the County to place any additional traffic control devices on the County's portion of 322nd Road. Second, Patterson asserts the district court erred in finding the County was immune from liability under the discretionary judgment exception to the KTCA for its failure put an advisory speed plaque on its portion of 322nd Road. Third, Patterson asserts the district court erred in finding that the Township had no duty to place traffic control devices or other warning signs on its portion of 322nd Road. Fourth, the County (in its cross-appeal) asserts the district court should have found the County was entitled to immunity for any failure to place a Dead End or No Outlet sign on its portion of 322nd Road under the discretionary function exception to liability, the recreational exception to liability, and the failure to inspect property of another exception to liability in K.S.A. 2015 Supp. 75-6104. In the analysis that follows, we will address the first, second, and fourth points together because the underlying issue in all three points of error is the

9

County's duty and the applicability of any statutory exceptions to that duty. We then will address Patterson's challenge to summary judgment in favor of the Township.

I. *The County*

The KTCA allows individuals to bring claims against governmental entities for the negligent or wrongful acts of their employees. K.S.A. 2015 Supp. 75-6103(a). Although there are exceptions to this general liability as set forth in K.S.A. 2015 Supp. 75-6104, government liability is the rule and immunity the exception. K.S.A. 2015 Supp. 75-6103; see *Carpenter v. Johnson*, 231 Kan. 783, 784, 649 P.2d 400 (1982).

In a negligence action, a plaintiff carries the burden of proving four elements: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, (3) causation between the breach of the duty and injury to the plaintiff, and (4) damages suffered by the plaintiff. *Shirley v. Glass*, 297 Kan. 888, Syl. ¶ 4, 308 P.3d 1 (2013). Whether a legal duty exists is a question of law for the court rather than a fact issue for the jury. *Berry v. National Medical Services, Inc.*, 292 Kan. 917, 920, 257 P.3d 287 (2011).

A. *Duty to conduct an engineering study*

Patterson claims the County was negligent in failing to conduct an engineering study to determine whether any additional warning traffic control devices were necessary on the County's portion of 322nd Road. In response, the County argues it had no duty to conduct the engineering study referenced by Patterson. To resolve this issue, we begin with the relevant statutes.

K.S.A. 8-2003 requires the secretary of transportation to adopt a manual and specifications for a uniform system of traffic-control devices within the state.

"The secretary of transportation shall adopt a manual and specifications for a uniform system of traffic-control devices consistent with the provisions of this act for use upon highways within this state. Such uniform system shall correlate with and so far as possible conform to the system set forth in the most recent edition of the manual on uniform traffic-control devices for streets and highways and other standards issued or endorsed by the federal highway administrator." K.S.A. 8-2003.

Pursuant to this statute, the secretary adopted the MUTCD. The 2009 edition was in effect at the time of the 2010 accident in this case.

K.S.A. 8-2004 imposes a duty on the secretary to place and maintain traffic-control devices as deemed necessary in accordance with the MUTCD and its specifications:

"(a) The secretary of transportation shall place and maintain such traffic-control devices, conforming to the manual and specifications adopted under K.S.A. 8-2003, and amendments thereto, upon all state highways as the secretary shall deem necessary to indicate and to carry out the provisions of this act or to regulate, warn or guide traffic."

K.S.A. 2015 Supp. 8-2005 imposes a duty on local authorities to place and maintain traffic-control devices as deemed necessary in accordance with the MUTCD and its specifications:

"(a) Local authorities in their respective jurisdictions shall place and maintain such traffic-control devices upon highways under their jurisdiction as they may deem necessary to indicate and to carry out the provisions of this act or local traffic ordinances or to regulate, warn or guide traffic. All such traffic-control devices hereafter erected shall conform to the state manual and specifications."

It is clear from the plain language of the statutes set forth above and from long-standing Kansas precedent that the MUTCD was adopted by the Kansas Department of

11

Transportation to carry out the stated public policy as declared by the legislature to regulate, warn, or guide traffic; thus, the MUTCD has the force and effect of law. See *Carpenter*, 231 Kan. at 787. Accordingly, we now turn our attention to the MUTCD to decide whether the County had a duty to conduct the engineering study as alleged by Patterson. We begin with some MUTCD definitions for words and phrases that are relevant to the issues presented.

- A highway is "a general term for denoting a public way for purposes of vehicular travel, including the entire area within the right-of-way." MUTCD § 1A.13.83
- An advisory speed is "a recommended speed for all vehicles operating on a section of highway and based on the highway design, operating characteristics, and conditions." MUTCD § 1A.13.8
- A traffic control device is "a sign, signal, marking, or other device used to regulate, warn, or guide traffic, placed on, over, or adjacent to a street, highway, private road open to public travel, pedestrian facility, or shared-use path by authority of a public agency or official having jurisdiction." MUTCD § 1A.13.238
- A sign is "any traffic control device that is intended to communicate specific information to road users through a word, symbol, and/or arrow legend. Signs do not include highway traffic signals, pavement markings, delineators, or channelization devices." MUTCD § 1A.13.193
- A plaque is "a traffic control device intended to communicate specific information to road users through a word, symbol, or arrow legend that is placed immediately adjacent to a sign to supplement the message on the sign. The difference between a plaque and a sign is that a plaque cannot be used alone." MUTCD § 1A.13.147

Notably, Patterson has framed the County's duty under the MUTCD here as one specific to performing an engineering study to determine whether any additional *warning* traffic control devices were necessary on the County's portion of 322nd Road. A warning sign is defined in the MUTCD as a "sign that gives notice to road users of a situation that

12

might not be readily apparent." MUTCD § 1A.13.252. Patterson asserts the County's duty to perform an engineering study for placement of warning signs in this case arises out of MUTCD § 2C.02, which provides that "[t]he use of warning signs shall be based on an engineering study or on engineering judgment." Patterson then cites to MUTCD § 1A.13.03.65, which defines an "engineering study" as:

> "[T]he comprehensive analysis and evaluation of available pertinent information, and the application of appropriate principles, provisions, and practices as contained in this Manual and other sources, for the purpose of deciding upon the applicability, design, operation, or installation of a traffic control device. An engineering study shall be performed by an engineer, or by an individual working under the supervision of an engineer, through the application of procedures and criteria established by the engineer. An engineering study shall be documented." MUTCD § 1A.13.03.65.

Relying on this language, Patterson contends the MUTCD requires that an engineering study be conducted on each road in a given jurisdiction to make all decisions related to placement of warning signs as defined in the MUTCD. But we find no language in the MUTCD to support Patterson's contention that the County has an unlimited duty to conduct an engineering study on every road within its territorial borders for purposes of considering placement of a warning sign. To the contrary, the MUTCD repeatedly makes clear that responsibility for the placement and maintenance of traffic control devices—including signage—rests with the public agency having jurisdiction over the particular roadway. The following sections, set forth in relevant part, support the MUTCD's mandate in this regard:

> "Section 1A.07 Responsibility for Traffic Control Devices
> "Standard:
> "01    The responsibility for the design, placement, operation, maintenance, and uniformity of traffic control devices shall rest with the public agency or the official having jurisdiction . . . .

13

"Section 1A.08 <u>Authority for Placement of Traffic Control Devices</u>

  "Standard:

"01     Traffic control devices, advertisements, announcements, and other signs or messages within the highway right-of-way shall be placed only as authorized by a public authority or the official having jurisdiction . . . for the purpose of regulating, warning, or guiding traffic.

"Section 1A.09 <u>Engineering Study and Engineering Judgment</u>

  "Standard:

"02     This Manual describes the application of traffic control devices, but shall not be a legal requirement for their installation." MUTCD §§ 1A.07, 1A.08, 1A.09.

So if the governmental entity is ultimately responsible for placement and maintenance of traffic control devices on all highways and roads in its jurisdiction, under what circumstances is an engineering study or engineering judgment required? One example of a standard requiring an engineering study is as follows:

"Section 2B.13 <u>Speed Limit Sign (R2-1)</u>

  "Standard:

"01     Speed zones (other than statutory speed limits) shall only be established on the basis of an engineering study that has been performed in accordance with traffic engineering practices. The engineering study shall include an analysis of the current speed distribution of free-flowing vehicles." MUTCD § 2B.13.

In addition to MUTCD standards that expressly require engineering studies, there also are MUTCD standards setting forth objective criteria which, if met, triggers a requirement for the governmental entity to seek input from an engineer to determine whether placement or use of a traffic signal might be justified. These criteria provide a nationally used, systematic method to evaluate the need for traffic signals. In the MUTCD, these criteria are called "warrants." A warrant is defined in the MUTCD as "a threshold condition based upon average or normal conditions that, if found to be satisfied as part of an engineering study, shall result in analysis of other traffic conditions or

14

factors to determine whether a traffic control device or other improvement is justified." MUTCD § 1A.13.253. Given its broad application, the satisfaction of a traffic signal warrant in the MUTCD cannot—in and of itself—require placement and use of a traffic control signal; again, engineering judgment or an engineering study ultimately must provide the justification. MUTCD § 4C.01.

One example of a warrant can be found at MUTCD § 3B.01, Yellow Center Line Pavement Markings and Warrants. The section begins with a requirement that, *when used*, center line pavement markings must be yellow and must mark the separation of traffic lanes going in opposite directions. Although it appears from the words we placed in italics that marking the pavement with a center line is optional, the section also includes the following requirement:

> "Center line markings shall be placed on all paved urban arterials and collectors that have a traveled way of 20 feet or more in width and an ADT of 6,000 vehicles per day or greater. Center line markings shall also be placed on all paved two-way streets or highways that have three or more lanes for moving motor vehicle traffic." MUTCD § 3B.01, Standard 09.

The requirement quoted above qualifies as a warrant because it identifies a threshold condition that triggers the governmental entity to ask an engineer to verify the identified threshold condition and then to conduct further analysis of other traffic conditions or factors to determine whether a traffic control device or other improvement is justified.

Unlike the example above, there are no warrants in the MUTCD related to placement or use of warning signs. See MUTCD Chapter 2C, Warning Signs and Object Markers. And we already have rejected Patterson's argument that the MUTCD imposes upon the County an unlimited duty to conduct an engineering study on every road within its territorial borders for purposes of considering placement of a warning sign. See MUTCD § 1A.02., Principles of Traffic Control Devices (traffic control device should

15

fulfill a stated need). In the absence of any other source of duty, we conclude Patterson has failed to establish that the MUTCD imposed a duty on the County to conduct an engineering study on its portion of 322nd Road for purposes of making a decision related to installation of warning traffic control devices described in the MUTCD. See *Berry*, 292 Kan. at 920 (whether legal duty exists is question of law for court rather than fact issue for jury). Because duty is the first element that must be proved to establish negligence, Patterson's assertion cannot serve as the basis for this particular claim against the County. See *Woodworth v. Idaho Transportation Board*, 154 Idaho 362, 367, 298 P.3d 1066 (2013) (affirming summary judgment in favor of state on plaintiff's claim that state was negligent in failing to conduct an engineering study because the MUTCD does not create any duty to conduct such study).

B. *Discretionary function exception to liability under the KTCA*

Patterson claims the County was negligent in failing to affix an advisory speed plaque of 5 miles per hour onto the existing Pavement Ends sign, failing to place a Dead End sign, and failing to place a No Outlet sign on its portion of 322nd Road. The County concedes it has a duty to place and maintain traffic-control devices on its highways as it deems necessary to carry out the provisions of the MUTCD as well as to regulate, warn, or guide traffic. But the County argues it is immune from liability in discharging these duties under several provisions of the KTCA. The district court held the County was entitled to discretionary function immunity under K.S.A. 2015 Supp. 75-6104(e) and (h) for failing to place an advisory speed plaque but not for failing to place a Dead End sign and a No Outlet sign.

The KTCA provides an exception to liability for governmental entities and employees engaged in "the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 2015 Supp. 75-6104(e). In addition, the

16

KTCA contains a more specific exception relating to traffic and road signs that provides exemption from liability resulting from

> "the malfunction, destruction or unauthorized removal of any traffic or road sign, signal or warning device unless it is not corrected by the governmental entity responsible within a reasonable time after actual or constructive notice of such malfunction, destruction or removal. Nothing herein shall give rise to liability arising from the act or omission of any governmental entity in placing or removing any of the above signs, signals or warning devices when such placement or removal is the result of a discretionary act of the governmental entity." K.S.A. 2015 Supp. 75-6104(h).

Over the years, the Kansas Supreme Court has considered numerous cases under a variety of fact patterns in deciding whether a function or duty is discretionary—and thus excepted from liability—as provided in the KTCA. Many of these cases were collected and cited in *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 262 P.3d 336 (2011), which is the last time our Supreme Court considered application of the KTCA's discretionary function exception to liability:

> "'Kansas courts look foremost to the nature and quality of the discretion exercised.' *Soto* [*v. City of Bonner Springs*], 291 Kan. [73,] 79[, 238 P.3d 278 (2010)] (citing *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 452, 912 P.2d 729 [1996]; *Robertson v. City of Topeka*, 231 Kan. 358, 361-62, 644 P.2d 458 [1996]). Further, '[t]he mere application of any judgment is not the hallmark of the exception.' *Soto*, 291 Kan. at 79 (citing *Allen v. Kansas Dept. of SRS*, 240 Kan. 620, 623, 731 P.2d 314 [1987]). But '[t]he more a judgment involves the making of policy[,] the more it is of a "nature and quality" to be recognized as inappropriate for judicial review.' *Kansas State Bank & Tr. Co.* [*v. Specialized Transportation Services, Inc.*], 249 Kan. [348,] 365[, 819 P.2d 587 (1991)]. The necessity that the actor employ expertise, whether educational or experiential, also is relevant to determining whether an action is discretionary or ministerial. See *Allen*, 240 Kan. at 623 (employee's action not discretionary when decision on how to clean vomit from floor did 'not invol[ve] any particular skill or training'). . . .
> . . . .

17

"This court also has repeatedly put emphasis on the mandatory versus permissive character of direction given to the defendant actor. '[W]here there is a "clearly defined *mandatory* duty or guideline, the discretionary function exception is not applicable." (Emphasis added.) *Soto*, 291 Kan. at 80 (quoting *Nero* [*v. Kansas State University*], 253 Kan. at 585[, 861 P.2d 768 (1993)]; and citing *Barrett v. U.S.D. No. 259*, 272 Kan. [250,] 263[, 32 P.3d 1156 (2001)]; *Kansas State Bank & Tr. Co.*, 249 Kan. at 365. For purposes of the exception, '[a] *mandatory* guideline can arise from agency directives, case law, or statutes.' (Emphasis added.) *Soto*, 291 Kan. at 80 (citing *Barrett*, 272 Kan. at 263; *Bolyard*, 259 Kan. at 452-54). Such a guideline leaves little to no room for individual decision making, exercise of judgment, or use of skill, and qualifies a defendant's actions as ministerial rather than discretionary. See *Nero*, 253 Kan. at 593-94 (citing *Dougan* [*v. Rossville Drainage Dist.*], 243 Kan. [315,] 322-23[, 757 P.2d 272 (1998)]) (ministerial act 'performance of some duty involving no discretion' where discretion defined as 'capacity to distinguish between what is right and wrong, lawful and unlawful, or wise or foolish sufficiently to render one amenable and responsible for his acts')." *Thomas*, 293 Kan. at 234-35.

Citing Professor William E. Westerbeke, the *Thomas* court observed that Kansas courts generally follow three guiding principles in deciding whether the discretionary function exception applies in a given case:

"(1) '[T]he discretionary function primarily involves policy-oriented decisions and decisions of such a nature that the legislature intended them to be beyond judicial review,' (2) 'the immunity does not depend upon the status of the individual exercising discretion and thus may apply to discretionary decisions made at the operational level as well as at the planning level,' and (3) 'the discretionary function does not encompass conduct that is deemed "ministerial," *i.e.*, conduct that involves no discretion.'" 293 Kan. at 235 (quoting Westerbeke, *The Immunity Provisions in the Kansas Tort Claims Act: The First Twenty-Five Years*, 52 Kan. L. Rev. 939, 960 [2004]).

Although not discussed by the court in *Thomas*, we find noteworthy some additional observations made by Professor Westerbeke with regard to how courts in

Kansas decide whether a function or duty is discretionary under the KTCA. In his review of precedent on the issue, Westerbeke found application of the principles set forth above vary from case to case. For example, he points out that some courts strictly construe the discretionary function exception by limiting it to policy-oriented decisions. 52 Kan. L. Rev. at 960-61. Cases where courts have limited the discretionary function exception to policy decisions include *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677 (1998) (conditions of release imposed on prisoner by parole board); *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 938 P.2d 1293 (1997) (appropriate facility in which to place a troubled youth); *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 912 P.2d 729 (1996) (placing children with mother); *G. v. State Dept. of SRS*, 251 Kan. 179, 833 P.2d 979 (1992) (removing child from foster home); and *Beck v. Kansas Adult Authority*, 241 Kan. 13, 735 P.2d 222 (1987) (conditions of release imposed on prisoner by parole board).

Conversely, other courts in Kansas have broadly construed the discretionary function exception to encompass all acts except those that are ministerial in nature. An act is ministerial in nature when the actor has no choice in how to proceed. Examples include duties imposed or conduct required by statute, regulation, ordinance, internal guideline, common-law standard, or contractual obligation. For instance,

> "obeying an ordinance that spells out the speed limit for fire trucks, [*e.g.*, *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984) (involving an accident between two responding fire trucks),] or cleaning up vomit in a hallway leading toward business premises, [*e.g.*, *Allen v. Kansas Dept. of S.R.S.,* 240 Kan. 620, 731 P.2d 314 (1987) (involving a lessee's failure to clean a hallway when he had undertaken such cleaning in the past),] or the performance of routine maintenance of warnings painted on the highway[, *e.g.*, *Huseby v. Bd. of County Comm'rs of Cowley County*, 754 F. Supp. 844 (D. Kan. 1990) (involving a county's failure to maintain a warning sign)] are tasks that involve little, if any, choice and no element of policy formation." Westerbeke, 52 Kan. L. Rev. at 962 & nn.123-25.

In addition to construing the discretionary function narrowly in some instances and broadly in others, Professor Westerbeke notes that some Kansas courts have applied a third standard that falls somewhere "between the strict discretionary function focusing on policy formulation and the broad discretionary function focusing on the absence of a clear ministerial standard." 52 Kan. L. Rev. at 963. Particularly relevant here is what Professor Westerbeke refers to as the professional judgment function:

"The clearest example of Kansas courts recognizing cases falling in the middle between discretionary and ministerial are the traffic signing immunity cases distinguishing between decision-making that is discretionary and immune and decision-making that is merely a matter of professional judgment and not immune. The traffic signing immunity protects governmental entities in cases involving the placement or removal of traffic signs, signals or warning devices, but only when such placement or removal is discretionary. [K.S.A. 2003 Supp. 75-6104(h).] Traffic signing decisions are guided by the Manual on Uniform Traffic Control Devices (MUTCD), [see *Carpenter v. Johnson*, 231 Kan. 783, 789-90, 649 P.2d 400 (1982) (discussing portions of the Maintenance Manual on Signs and Markers for Highways in Kansas, which is derived from the MUTCD),] which may provide relevant criteria to guide some, but not all, traffic signing decisions. In those situations in which the manual provides sufficient guidelines, the decision to place or remove a traffic sign, signal or warning device may be deemed a matter of professional judgment not protected as a discretionary function. [See, *e.g.*, *Kastendieck v. Bd. of County Comm'rs*, 934 F. Supp. 387, 390-91 (D. Kan. 1996) (holding that placement of reflective delineators to mark a curve is discretionary because of optional language in the MUTCD); *Huseby v. Bd. of County Comm'rs of Cowley County*, 754 F. Supp. 844, 847 (D. Kan. 1990) (citing the MUTCD in determining whether the placement of a warning sign on a curve was mandatory or discretionary); *Finkbiner v. Clay County*, 238 Kan. 856, 860, 714 P.2d 1380 (1986) (same); *Carpenter*, 231 Kan. at 789-90 (same).] These decisions may be complex and involve balancing many factors, but they are not particularly distinguishable from the many professional judgments in engineering and other professions that are routinely litigated in the private sector." 52 Kan. L. Rev. at 963-64 & nn.130-32.

One example of decisionmaking that may be merely a matter of professional judgment and not protected by the discretionary immunity function are the MUTCD standards for warrants. Again, warrants set forth objective criteria that trigger the need for engineering input to determine whether traffic signals are justified. The question at that point becomes whether those employees are exercising discretion within the meaning of the KTCA or merely exercising professional judgment within established guidelines.

Based on the discussion above, we agree with Professor Westerbeke that Kansas courts have used a range of standards to determine whether the discretionary function exception in the KTCA applies in a given case and that there does not yet exist a clearly defined standard for making such a determination. Because the discretionary function exception to the KTCA essentially mirrors the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a) (2012) we believe it is helpful to look at federal decisions on the issue.

In *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), the United States Supreme Court set forth a two-part test to determine whether the discretionary function exception applies to a given set of facts. See 486 U.S. at 536. In the first part of the test, the court determines whether the act or omission is discretionary in nature. An act is discretionary if it involves an element of judgment or choice. An act is not discretionary "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." 486 U.S. at 536. This part of the test comports with the approach that some Kansas courts have taken that broadly construe limitations on the state's waiver of sovereign immunity.

If the conduct involves an element of judgment or choice and there is no mandatory regulation or policy requiring a particular course of action, the court moves to the second part of the test to determine if the conduct at issue was the kind of

discretionary function that the exception was designed to cover. 486 U.S. at 536. The discretionary function exception is designed to prevent "'judicial "second-guessing"'" and therefore "protects only governmental actions and decisions based on considerations of public policy." 486 U.S. at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S. Ct. 2755, 81 L. Ed. 2d 660 [1984]); see also *United States v. Gaubert*, 499 U.S. 315, 323, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). This part of the test comports with the approach that other Kansas courts have taken that strictly construe limitations on the state's waiver of sovereign immunity.

In *Gaubert*, 499 U.S. at 322, the Supreme Court elaborated on the discretionary function exception. First, courts are not to consider the subjective intent of the particular actor or whether he or she was motivated by a concern for public policy; rather, courts must consider whether the actions taken, by their nature, implicate public policy concerns or are "susceptible to policy analysis." 499 U.S. at 325. Second, when a statute, regulation, or policy expressly or impliedly permits a government agent to exercise discretion, a presumption arises that the agent's acts are grounded in policy when exercising that discretion. 499 U.S. at 324. Nevertheless, the "facts of the specific case may overcome the presumption to which the government is entitled under *Gaubert*" where it is "obvious that a decision implicates none of the public policies that ordinarily inform an agency's decisionmaking." *Elder v. United States*, 312 F.3d 1172, 1182 (10th Cir. 2002). Given the interplay between the two parts of the *Berkovitz-Gaubert* test, certain acts, although involving choices between options, do not fall within the scope of the discretionary function exception because they involve options unrelated to any policy objectives. For example, a government employee who falls asleep while driving her car on official duty is not protected by the exception because her negligent judgment in falling asleep "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7.

As applied, the federal test differentiates between discretionary acts reflecting true policy decisions that are immune from liability and other acts that may involve choice or judgment but are not related to any plausible policy objective and therefore are not immune from liability. Significantly, the factors utilized in the federal test are not new to Kansas; the test is simply a clearer and more consistent characterization of the analytical framework currently being used by Kansas courts to decide these issues. In fact, some of the earlier KTCA cases discussing application of the discretionary function exception to the KTCA specifically refer to federal caselaw construing the FTCA generally and under similar factual scenarios. See *Robertson v. City of Topeka*, 231 Kan. 358, 362, 644 P.2d 458 (1982) ("Our review of the federal cases convinces us that it is the nature and quality of the discretion exercised which should be our focus rather than the status of the employee exercising that discretion."); *Beck*, 241 Kan. at 34 (discussing federal cases construing discretionary function exception to FTCA in applying discretionary function exception to KTCA); *Nero v. Kansas State University*, 253 Kan. 567, 586, 861 P.2d 768 (1993) (finding prior Kansas Supreme Court precedent construing application of KTCA discretionary function immunity consistent with United States Supreme Court precedent construing application of FTCA discretionary function immunity). We find no later authority rejecting these analogies as inappropriate. By utilizing the analytical framework set forth in *Berkovitz* and *Gaubert*, we preserve the fundamental principles previously applied by Kansas courts while benefiting from a clearly defined standard to determine whether immunity attaches to discretionary functions. For this reason, we find it appropriate to apply the *Berkovitz-Gaubert* test to the matter at hand to determine whether the County's failure to place the warning signs at issue falls within the scope of discretionary immunity under K.S.A. 2015 Supp. 75-6104(e). As the party claiming the exception to liability based on a discretionary function, the County has the burden to establish that its decision to place (or not place) the warning signs (1) involves an element of individual judgment or choice and (2) is the kind of function susceptible to public policy analysis. Decisions at all levels of government, including frequent or routine decisions, may be protected by discretionary function immunity if the decisions

23

require analysis of government policy concerns. See K.S.A. 2015 Supp. 75-6104(e) (although originally adopting the FTCA's language for the discretionary function exception word for word, the Kansas Legislature later added the words "and regardless of the level of discretion involved").

### 1. *An element of individual judgment or choice*

To determine whether the County's decision to place (or not place) warning signs involves individual judgment or choice, we again turn our attention to the MUTCD. The guidelines and recommendations set forth in MUTCD are divided into three relevant categories: (1) "Standard," which refers to signs that are required, mandatory, or specifically prohibited; (2) "Guidance," which refers to recommended, but not mandatory, practice; and (3) "Option," which refers to "a permissive condition and carries no requirement or recommendation." MUTCD § 1A.13A-C. Which guidelines and recommendations apply to a certain road is dependent on the type of road at issue. Certain roads are characterized as "low volume" roads and will usually require less signage than other, nonlow volume, roads. See MUTCD §§ 2C, 5C.

Here, the district court found it was uncontroverted that "322nd Road east of the pavement is a low volume road." The County asserts that the district court's finding is too narrow, claiming that its portion of 322nd Road east of 111th Road is also a low volume road. Although the County's statement in this regard was not controverted by Patterson below, she now argues that it is not supported by the record. The designation of the County's portion of 322nd Road as nonlow volume or low volume is irrelevant for our purposes, however, because both sections of the MUTCD each similarly provide that the use of advisory speed plaques and Dead End or No Outlet signs is merely an Option.

For nonlow volume roads, the MUTCD provides: "The Advisory Speed . . . plaque . . . *may* be used to supplement any warning sign to indicate the advisory speed for

24

a condition." (Emphasis added.) MUTCD § 2C.08.01; see also MUTCD § 2C.30.02 (presenting an advisory speed plaque as an Option for use in conjunction with a Pavement Ends sign). If an advisory speed plaque is used, "[t]he advisory speed shall be determined by an engineering study that follows established engineering practices." MUTCD § 2C.08.06. The MUTCD also provides that on nonlow volume roads, a Dead End sign "*may* be used at the entrance of a single road or street that terminates in a dead end or cul-de-sac." (Emphasis added.) MUTCD § 2C.26.01. This section of the MUTCD further states that a No Outlet sign "*may* be used at the entrance to a road or road network from which there is no other exit." (Emphasis added.) MUTCD § 2C.26.01.

For low volume roads, the MUTCD provides: "An Advisory Speed . . . plaque . . . *may* be mounted below a warning sign when the condition requires a reduced speed." (Emphasis added.) MUTCD § 5C.10.01. The MUTCD also provides that on low volume roads, Dead End and No Outlet signs "*may* be used to warn road users of a road that has no outlet or that terminates in a dead end or cul-de-sac." (Emphasis added.) MUTCD § 5C.11.01.

Regardless of the designation of the County's portion of 322nd Road as nonlow volume or low volume, there is no standard within the MUTCD that requires a governmental entity to follow any specific course of action related to the placement of an advisory speed plaque, a Dead End sign, or a No Outlet sign. And as we previously concluded, the MUTCD chapter on warning signs contains no warrants or other detailed criteria that could be construed as a threshold condition that would, if met, require a governmental entity to request an engineering study be performed or engineering judgment be provided with respect to placement of an advisory speed plaque, a Dead End sign, or a No Outlet sign. See MUTCD Chapter 2C, Warning Signs and Object Markers.

Because the MUTCD does not require the County to adhere to a particular directive in the placement of traffic warning signs, the County's decision to place (or not

25

place) the warning signs as alleged here involves an element of individual judgment or choice. Therefore, the County has satisfied the first part of the *Berkovitz-Gaubert* test necessary to come within the discretionary function exception. See *Berkovitz*, 486 U.S. at 536.

### 2. *Susceptible to public policy analysis*

In this second part of the *Berkovitz-Gaubert* test, we must decide whether the County's decision to place (or not place) the warning signs at issue is the kind of function susceptible to public policy analysis. This test is meant to draw a line of distinction between a discretionary function the exception was designed to shield and an ordinary tort that is only tangentially related to regulatory policy. *Berkovitz*, 486 U.S. at 536. Significantly, the facts presented in this case provide the County with the benefit of a presumption that the decisions at issue are based on public policy concerns. See *Gaubert*, 499 U.S. at 324 (when statute, regulation, or policy expressly or impliedly permits government agent to exercise discretion, a presumption arises that the agent's acts are grounded in policy when exercising that discretion). The presumption applies based on the MUTCD as a regulation or policy expressly or impliedly permitting the County to exercise discretion in placing warning signs. To overcome this presumption, Patterson must show that a decision by the County regarding whether to place a warning sign is *not* the kind of conduct that can be said to be based on public policy considerations.

In an effort to do so, Patterson argues long-standing legal precedent in Kansas requires courts to engage in a "totality of the circumstances" analysis to decide whether discretionary function immunity applies and that this line of cases takes priority over any presumption of discretion created by the MUTCD. Under a totality of the circumstances analysis, Patterson claims courts must consider all of the factual and legal circumstances surrounding the dangerous condition alleged to have caused the harm in determining

whether the government is entitled to discretionary function immunity. A review of these cases establishes that Patterson's reliance is misplaced.

The first in this line of cases is *Carpenter v. Johnson*, 231 Kan. 783, 649 P.2d 400 (1982). Daniel Carpenter was a passenger in an automobile being driven by Damon Johnson. As it was proceeding in an easterly direction, the vehicle left a curve and struck an embankment. Carpenter sustained injuries. It is undisputed that, at the time of the accident, the curve was not marked with any warning signs. Relevant here, Carpenter sued the State of Kansas and Shawnee County, alleging failure to erect a warning sign in accordance with the MUTCD. Both defendants raised discretionary function immunity as an affirmative defense. The trial court held that the exception to liability for signing "constituted an absolute bar, as a matter of law, to any action against a governmental entity for failure to cause the initial placement of any traffic signal, road sign or warning device. In so doing, the trial court reasoned that such determination was a wholly discretionary function" under the KTCA. 231 Kan. at 790.

Carpenter appealed. The Supreme Court reversed, holding "professional judgment rather than governmental discretion is at issue in the case at bar." 231 Kan. at 789. In support of its holding, the court cited to the standards for signing on turns and curves set forth in the 1962 edition of the MUTCD, which was in effect at the time the road in question was built. Section 2C-5 provided:

> "'The Curve sign . . . is intended for use where engineering investigations of roadway, geometric, and operating conditions show the recommended speed on the curve to be in the range between 30 and 60 miles per hour and equal to or less than the speed limit established by law or by regulation for that section of highway. Additional protection may be provided by use of the Advisory Speed plate.'" 231 Kan. at 788.

27

"[ILLUSTRATED SIGN]

'W1-1

"30" X 30"

'The Turn sign showing an arrow bent at a right angle . . . shall be used to mark curves on which a ball-blank indicator shows banks of 10 degrees or more at a speed of 30 miles per hour. Where a Turn sign is warranted, a Large Arrow sign shall be used on the outside of the turn. Additional protection shall be provided by use of the Advisory Speed plate. . . .


"[ILLUSTRATED SIGN]

'W1-2

"30" X 30"

'The Curve sign, showing a curved arrow . . . shall be used to mark a curve where a test with a ball-blank indicator gives readings of 10 degrees or more at speeds between 21 and 66 miles per hour.

'Additional protection shall be provided by the use of the Advisory Speed plate.'"

231 Kan. at 790.


Noting that these standards represent "rather detailed recommendations in placement of warning signs" to guide engineers employed by state and local governments, the court indicated the question presented was "whether those employees are exercising discretion within the meaning of the KTCA or merely exercising professional judgment within established guidelines." 231 Kan. at 788. Based on the facts presented in the case and the mandatory language ("shall") used in the MUTCD with regard to the circumstances that trigger the use of signs for turns and curves, the court concluded the decision to place signs was one of professional judgment within established guidelines of the MUTCD. Because it was a matter of professional judgment, the court held the decision to place a sign did not come within the protection of the discretionary function immunity exception to liability. The decision of the trial court granting immunity was reversed and the matter was remanded. 231 Kan. at 790.

The *Carpenter* court framed its holding as follows: "Whether or not the placement of a warning sign on the particular curve in controversy herein was discretionary or mandatory depends upon the totality of the circumstances involved." 231 Kan. at 290. Because the court relied on MUTCD-established guidelines requiring placement of warning signs under certain conditions, the phrase "totality of the circumstances" in the court's holding refers to the applicable provisions of the MUTCD. We are not persuaded, as Patterson appears to argue, that the totality of the circumstances analysis announced in *Carpenter* requires courts to consider all of the factual and legal circumstances surrounding the dangerous condition alleged to have caused the harm in determining whether the government is entitled to discretionary function immunity.

Our conclusion in this regard is supported by the analysis in *Toumberlin v. Haas*, 236 Kan. 138, 689 P.2d 808 (1984). The plaintiffs were injured when two vehicles collided at the intersection of two low volume county roads. Plaintiffs sued Franklin County, alleging negligence by the county for failing to place proper warning signs at the intersection. The county raised discretionary function immunity as an affirmative defense. Consistent with analysis conducted by the court in *Carpenter*, the court in *Toumberlin* held that whether the placement of a sign is discretionary or mandatory turns on whether the applicable provisions of the MUTCD (totality of the circumstances) require such a sign to be placed.

> "In the present case, the trial court's ruling against the plaintiffs on the
> discretionary nature of the duty of Franklin County came after the conclusion of all the
> evidence. Plaintiffs had presented absolutely no engineering testimony that the placement
> of any type of sign at the intersection was warranted or required under the terms of the
> Manual on Uniform Traffic Control Devices. Plaintiffs presented no engineering studies
> or accident history regarding the intersection which would have justified any type of sign.
> The only engineer who did testify stated that no sign was required or justified at the
> intersection due to the low volume of traffic. Based on the total lack of evidence
> presented by the plaintiffs to support the proposition that some type of sign was mandated

29

at this intersection, the trial court was clearly correct in ruling that there was insufficient evidence for the case to go to the jury on the issue of whether the placement of a sign was mandatory or discretionary. The only testimony heard by the court supported the proposition that signing at this particular intersection was discretionary." *Toumberlin*, 236 Kan. at 142.

As in *Carpenter*, the totality of the circumstances analysis utilized by our Supreme Court in *Toumberlin* does not—as Patterson alleges—require courts to consider all of the factual and legal circumstances surrounding the dangerous condition alleged to have caused the harm in determining whether the government is entitled to discretionary function immunity.

Next, Patterson cites *Finkbiner v. Clay County*, 238 Kan. 856, 861, 714 P.2d 1380 (1986). Alleging the facts in *Finkbiner* are nearly indistinguishable from those presented here, Patterson argues *Finkbiner* definitively overrides any presumption of immunity based on stated public policy set forth in the MUTCD. We are not persuaded by Patterson's argument. In *Finkbiner*, the plaintiff sued after driving his pickup truck off the end of a township road and into a dry creek bottom. There was no dispute that the road belonged to the township, the road had no signs or markers, the road terminated by dropping off into a riverbed, and Finkbiner—who had never driven on the road before— drove into the riverbed traveling at approximately 40-50 miles per hour damaging his truck and injuring himself. Finkbiner alleged the county and the township were negligent in failing to erect a warning sign in accordance with the MUTCD. Both the county and the township moved for summary judgment based on discretionary function immunity.

The district court determined that both entities were immune based on the exception to liability for discretionary functions by government entities. Finkbiner appealed. The Supreme Court ultimately reversed the district court's decision as to the township. In so doing, the court specifically relied on the following language from the 1978 edition of the MUTCD, which was in effect at the time of the accident in that case,

as the applicable standard for placing signs: "'Signs are *essential* where special regulations apply at specific places or at specific times only, or *where hazards are not self evident*.' [MUTCD] Section 2A-1, 'Functions of Signs.'" (Emphasis added.) *Finkbiner*, 238 Kan. at 860.

Based on this language, the court concluded, as a matter of law, that it could not determine whether the county's failure to erect a warning sign was a discretionary act subject to immunity or a mandatory requirement subject to liability for breach. Specifically, the court found the record did not contain the facts necessary to determine whether the hazard (the drop-off) alleged to have caused the injury was self-evident. Based on the language of MUTCD § 2A-1, signs are only essential where hazards are not self evident. The court ultimately reversed and remanded the case for further findings:

> "Where a plaintiff claims both the county's and the township's failure to warn him, as required by the MUTCD, of a hazard that was not self-evident caused his injuries, it is necessary to determine: (1) what governmental entities are responsible for the safety of travelers upon the road; (2) whether or not a hazard exists; [and] (3) whether or not the hazard is self-evident . . . ." *Finkbiner*, 238 Kan. at 860-61.

The court explained that if the facts and testimony on remand established that the hazard was not self-evident, the mandate under MUTCD § 2A-1 requiring the local government to place signs would be triggered; thus, it would then be "a matter of professional judgment rather than governmental discretion as to whether a certain sign should be placed." *Finkbiner*, 238 Kan. at 860. The court noted that matters of professional judgment include decisions about "the proper signs or barricades needed to warn travelers in order to provide adequate time for the driver to perceive, identify, decide, and perform any necessary maneuver." 238 Kan. at 861. And a matter of professional judgment—even if it is the judgment of a professional engineer working for a governmental entity—does not come within the protection of the discretionary function immunity exception to liability because such judgment is not grounded in public policy

31

concerns. See Westerbeke, 52 Kan. L. Rev. 939 (in those cases where MUTCD provides sufficient criteria to guide traffic signing decisions, court may find decision to place or not place traffic signs to be matter of professional judgment, which is not subject to discretionary immunity).

Patterson urges us to conclude as a matter of law, like the court did in *Finkbiner*, that remand on the issue of discretionary immunity in this case is necessary so that a factfinder can determine whether the hazard presented here (322nd Road abruptly coming to a dead end at the banks of the Arkansas River) was self-evident. But the mandatory language in MUTCD § 2A.1 requiring signs where hazards are not self-evident was removed in the 2000 version of the MUTCD, and there have been no provisions since 2000 that require the County to adhere to any particular directive in the placement of traffic warning signs. This leaves us where we started—with the presumption that the County's failure to place a warning sign was a discretionary act grounded in policy. The following MUTCD provisions in the 2009 version of the manual bear out this presumption.

The stated function of a warning sign is to alert road users to unexpected conditions on or adjacent to a highway and to situations that might not be readily apparent to road users, including conditions that may call for a reduced speed or other action to ensure safe and efficient traffic operations. MUTCD § 2C.01. But the "use of warning signs should be kept to a minimum as the unnecessary use of warning signs tends to breed disrespect for all signs." MUTCD § 2C.02. And as a matter of public policy in Kansas, a traffic control device should fulfill a need to be effective. MUTCD § 1A.02. The need for a traffic control device comes to the attention of local government in a variety of ways:  the existence of a clearly defined mandatory duty (for example, an MUTCD standard), the existence of objective criteria which, if met, triggers an engineering study (for example, an MUTCD warrant), the submission of a specific request from the public (for example, a request for the installation of a traffic control

device at a particular intersection), or the occurrence of a particular safety concern (for example, previous accidents at a particular location).

In this case, there has been no evidence that the need for a traffic control device came to the attention of the County. There is no evidence of a clearly defined mandatory duty, no evidence that there exists objective criteria which, if met, triggers an engineering study, no evidence of request from the public and, prior to this accident, no evidence of a particular safety concern. The MUTCD reflects public policy in Kansas as determined by the legislature. We find the County's decision to place (or not place) the warning signs at issue is consistent with, and the kind of function susceptible to, this public policy analysis. The County's decision to place warning signs on its highways and roads is an integral part of its governmental policy-making and planning. We acknowledge that some negligent acts, such as those borne out of laziness, hastiness, or inattentiveness, do not implicate any of the public policy concerns that ordinarily provide the basis for a governmental entity's decision. See *Gaubert*, 499 U.S. at 325 n.7 (government employee who falls asleep while driving her car on official duty is not protected by the exception because her negligent judgment in falling asleep "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish"). But Patterson has not alleged any such negligent acts here. Instead of being a run-of-the-mill tort that is only tangentially related to government function, the signing decisions at issue in this case are the kind of conduct that "the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

Having satisfied both the first and second parts of the *Berkovitz-Gaubert* test, we find the County is entitled to discretionary function immunity against Patterson's claims of negligence for failing to place an advisory speed plaque, a Dead End sign, and a No Outlet sign on its portion of 322nd Road.

C. *Recreational use immunity exception to liability under the KTCA*

The County also asserts that it is entitled to recreational use immunity under K.S.A. 2015 Supp. 75-6104(o) in response to Patterson's claim that it was negligent in failing to affix an advisory speed plaque onto the existing Pavement Ends sign, failing to place a Dead End sign, and failing to place a No Outlet sign on its portion of 322nd Road. The recreational use exception to governmental liability under the KTCA provides:

> "A government entity . . . shall not be liable for damages resulting from:
>
> . . . .
>
> "(o) any claim for injuries resulting from the use of any public property intended or permitted to be used as a park, playground or open area for recreational purposes, unless the governmental entity or an employee thereof is guilty of gross and wanton negligence proximately causing such injury." K.S.A. 2015 Supp. 75-6104(o).

The Kansas Supreme Court has extended coverage of the recreational use exception to places outside a park or other recreational area if those places are "integral" to its use. *Poston v. U.S.D No. 38*7, 286 Kan. 809, 815-16, 189 P.3d 517 (2008) (while the school commons' primary use may have been nonrecreational, during recreational use of the gymnasium the school commons had a recreational use integrally tied to the gymnasium). The *Poston* court indicated, however, an outside place merely "incidental" to a recreational area's function will not enjoy recreational use immunity. 286 Kan. at 818-19; see *Wilson v. Kansas State University*, 273 Kan. 584, 590, 44 P.3d 454 (2002) (court draws distinction between incidental and integral purposes to find restrooms at football stadium subject to recreational use immunity).

There is no dispute that the Kaw Wildlife Area is a recreational area and that 322nd Road is not. But the County claims that it is entitled to recreational use immunity anyway because 322nd Road is an integral component to the Kaw Wildlife Area due to its physical proximity. We disagree. The evidence simply fails to establish the County is

34

entitled to judgment as a matter of law on the theory that 322nd Road is essential to the use of the Kaw Wildlife Area as a recreational area. First of all, the County's portion of the road is separated from the Kaw Wildlife Area by the unpaved part of the road under the Township's jurisdiction. If we were to adopt the County's position, the government could be immune from liability for any accident that occurred on public roads that eventually lead to a recreational area. The legislature could not have intended for this provision to abrogate our government's duty to provide safe roads. The fact that the accidental death occurred on recreational property, after the decedents traversed the County's road, should not provide the County with recreational immunity. Additionally, there is no evidence that 322nd Road is integral to the functionality of the Kaw Wildlife Area. Indeed, 322nd Road apparently existed for over 100 years before the Kaw Wildlife Area was created and, more importantly, is not the only road from which the Kaw Wildlife Area is accessible. The record fails to show as a matter of law that the Kaw Wildlife Area would be unavailable for recreational use without 322nd Road. On summary judgment, the County is obligated to present undisputed facts establishing its claim for recreational use immunity on this basis. The evidentiary record, however, falls short on this issue. The purpose of K.S.A. 2015 Supp. 75-6104(o) is not fulfilled by granting immunity to the County on the record presented here; thus, the district court properly denied the County summary judgment on this basis.

D. *Immunity for failing to inspect property of another*

In response to Patterson's claim that the County was negligent in failing to place various warning signs on its portion of 322nd Road to warn drivers about the road that dead ends at the banks of the Arkansas River, the County asserts it is entitled to immunity under the exception to government liability for damages resulting from a failure to inspect the property of others for hazards to public health or safety. See K.S.A. 2015 Supp. 75-6104(k) ("A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from . . . the failure to

35

make an inspection, or making an inadequate or negligent inspection, of any property other than the property of the governmental entity, to determine whether the property complies with or violates any law or rule and regulation or contains a hazard to public health or safety."). In response to the County's claim of immunity, Patterson alleges the County already was aware that 322nd Road ended at the Arkansas River; thus, no inspection would be necessary to further establish the existence of the hazard. Reasoning that the issue of whether the County already was aware of the hazard (which would make an inspection unnecessary) involved a question of fact for the jury, the district court denied the County's request for summary judgment under K.S.A. 2015 Supp. 75-6104(k).

But the legal issue to be resolved here is not whether the County was aware of the hazard or whether an inspection was necessary. Patterson's claim of negligence against the County presupposes that the County already knew about the hazard. Specifically, Patterson claims the County had a duty to place various warning signs on its portion of 322nd Road to warn drivers about the road that dead ends at the banks of the Arkansas River. In asserting this particular defense, the County does not dispute that it has a duty to place warning signs. Instead, the County claims that it is immune from suit for any alleged failure to make an inspection of any property other than its own (specifically, the road where it dead ends at the river bank) to determine whether there exists a hazard to public health or safety. Patterson is not asserting a duty to inspect, and the facts presented here do not justify the application of an exception to immunity based on a failure to inspect. Simply put, this is not an inspection case. Although we affirm the district court's decision to deny the County's request for summary judgment under K.S.A. 2015 Supp. 75-6104(k), we do so because subsection (k) is not applicable to the facts of this case; thus, no factual findings are needed on the issue of whether the County already was aware of the hazard or whether an inspection was necessary.

36

II. *The Township*

Patterson argues the district court erred in granting summary judgment to the Township. Specifically, Patterson challenges the court's finding that the Township had no legal duty to place traffic control devices or other warnings on the unpaved portion of 322nd Road. Before addressing Patterson's claim of error, we pause to clarify what we are, and what we are not, deciding today. As framed by Patterson, the issue presented for decision is whether the district court erred in deciding that the Township had no legal duty to place traffic control devices or other warnings on the unpaved portion of 322nd Road. We have not been asked to decide, and thus do not undertake the task of deciding, whether any other private or public entity had a legal duty to place traffic control devices or other warnings on the unpaved portion of 322nd Road.

With that clarification, we are ready to move on to our analysis. Deciding whether the Township had a legal duty to place traffic control devices or other warnings on the unpaved portion of 322nd Road necessarily involves a detailed review of certain relevant statutes and caselaw relating to regulation of county and township roads.

A. *Background*

1. *Relevant statutory provisions*

Kansas statutes distinguish between county roads and township roads. K.S.A. 2015 Supp. 68-101(c) defines "'[c]ounty roads'" to mean "all roads designated as such by the board of county commissioners." Under K.S.A. 68-515b, a county may adopt a county road unit system. With the adoption of a county road unit system, all townships within the county must relinquish to the county commissioners all money and equipment accumulated by them for road construction and maintenance purposes. K.S.A. 68-516a and K.S.A. 68-516b. Thereafter, those townships have no further authority to construct or maintain any roads; that authority rests solely with the county commissioners. See Att'y

37

Gen. Op. No. 85-132, 1985 WL 204824, at *1 (1985). K.S.A. 2015 Supp. 68-101(e) defines "'[t]ownship roads'" to mean "all roads within a township not within a county road unit county other than federal, state, and county roads."

According to the testimony of Randall Allen, Executive Director of the Kansas Association of Counties (KAC), which was given to the Senate Transportation Committee on March 18, 2003, there are 69 counties in Kansas that have adopted a county road unit system, leaving 36 counties that have not. It is undisputed that Cowley County has not adopted a county road unit system. Therefore, maintenance over township roads in the County still rests, in some degree, with the townships. There are several statutory provisions that are relevant to this issue.

As previously discussed, K.S.A. 2015 Supp. 8-2005(a) provides local authorities with the responsibility of placing and maintaining traffic control devices:

> "Local authorities in their respective jurisdictions shall place and maintain such traffic-control devices upon highways under their jurisdiction as they may deem necessary to indicate and to carry out the provisions of this act or local traffic ordinances or to regulate, warn or guide traffic. All such traffic-control devices hereinafter erected shall conform to the state manual and specifications."

K.S.A. 8-1432 defines "'[l]ocal authorities'" as "the Kansas turnpike authority and every city, county and other local board or body having authority to adopt ordinances or regulations relating to vehicular traffic under the constitution and laws of this state."

Finally, K.S.A. 2015 Supp. 68-526(a) provides:

> "In all counties not operating under the county road unit system the township board shall have the general charge and supervision of all township roads and township culverts in their respective townships. The board shall procure machinery, implements,

tools, drain tile, stone, gravel and any other material or equipment required, for the construction or repair of such roads and culverts. All work shall be done in accordance with plans and specifications and the general regulations to be prepared and furnished by the county engineer."

2. Finkbiner v. Clay County

In 1986, the Kansas Supreme Court issued its decision in *Finkbiner v. Clay County*, 238 Kan. 856, 714 P.2d 1380 (1986). As discussed earlier in the context of discretionary function immunity, the facts in *Finkbiner* are remarkably similar to those in the present case. There, the plaintiff filed suit against a county and a township for failure to warn of a dead end on a township road after he drove his truck off the road into a dry creek bottom. The county and the township each moved for summary judgment based on discretionary function immunity under the KTCA, and the district court granted both motions.

Relevant to the issue of whether a township has authority to place and maintain traffic control devices, the Supreme Court held on review that the township alone, and not the county, was responsible for maintaining the safety of township roads:

"Since all parties agree that the Township alone was responsible for the township road, the County cannot be liable for failure to place signs warning of a dead end on the township road. A township, having the exclusive care and control of a street or road, has a duty to maintain that road or street for the safe passage of persons and property. Other governmental entities cannot be held liable for failure to maintain that road safely. [Citation omitted.]" 238 Kan. at 861.

3. *Attorney General Opinion No. 97-25*

In 1997, 11 years after the court issued its opinion in *Finkbiner*, the Kansas Attorney General's Office issued an opinion that identified a potential conflict between

39

the statutes relating to a township's authority to place and maintain traffic control devices on township roads. This opinion expressed the Attorney General's belief, consistent with prior opinions of the Attorney General on this same issue, that a township is not a "local authority" as defined by K.S.A. 8-1432. As a result, the opinion concluded that a township lacks authority under K.S.A. 2015 Supp. 8-2005(a) to place or maintain traffic control devices on township roads. The opinion acknowledged that this interpretation conflicted with K.S.A. 68-526, which gives a township board "the general charge and supervision of all township roads" and noted that the conflict had not yet been addressed by our courts. Att'y Gen. Op. No. 97-25, 1997 WL 156490, at *2.

### 4. *2003 statutory amendments*

In 2003, this conflict was brought before the Kansas Legislature in the form of House Bill 2150. The purpose of the bill was to "harmonize conflicting statutory provisions relating to traffic signs along township Roads." See Minutes, House Transportation Committee, February 20, 2003, attach. 3. Evan H. Ice, Douglas County Counselor, testified on behalf of Douglas County in support of the bill. Ice stated that in Douglas County and other counties not operating under a county road unit system, the county generally installed and maintained regulatory signs (speed limits, no parking, and stop signs) along township roads, while the township installed and maintained warning signs (advising of upcoming travel hazards) and guidance signs (providing direction). Ice explained that counties were responsible for the regulatory signs because townships (1) do not have statutory or "home rule" authority to pass traffic regulations, (2) townships generally are not prepared to provide traffic studies that are often required before installing regulatory signs, and (3) townships do not have enforcement personnel. Ice stated that due to the statutory conflict pointed out by Attorney General Opinion 97-25, it was unclear who had the responsibility and authority to maintain traffic control devices along township roads in counties that have not adopted a county road unit system. Ice explained the problematic nature of this conflict: "If an accident occurs along a township

40

road as a result of improper signage, plaintiffs can now sue both the township and the county. The township will point its finger at the county and the county will point its finger at the township." According to Ice, House Bill 2150 would resolve any ambiguity and would provide that all townships had the responsibility and authority to post and maintain traffic control devices along township roads, with the exception of regulatory signs, which must comply with resolutions of the board of county commissioners.

Keith Browning, Douglas County Public Works Director and County Engineer, also testified in support of the bill. Browning noted that the KAC had included the issue in its platform for the previous 4 years. Browning indicated that in the 36 Kansas counties that do not operate under a county road unit system, the county typically installed and maintained signs on county roads while townships installed and maintained warning and guide signs on township roads, as well as regulatory signs that were authorized by the board of county commissioners.

Allen, Executive Director of the KAC, also testified that the full membership of the KAC had adopted the position set forth by House Bill 2150. Allen believed it was important for the legislature to clarify who had responsibility and authority to maintain traffic control devices along township roads.

The House passed House Bill 2150 on February 26, 2003. The bill moved to the Senate Transportation Committee, who heard the same testimony outlined above. In addition, the Butler County Engineer noted his county's support for the legislation. At that time, there was some question as to why the only testimony in support of the bill came from county representatives and not from any townships. At a later meeting, legislators from Douglas, Sedgwick, and Shawnee counties expressed their support of the bill. Despite support from the KAC, the bill ultimately was amended to include only Douglas, Sedgwick, and Shawnee counties based on information that there were numerous counties throughout the state that lacked knowledge of the proposed

41

legislation. The bill was later amended to also include Johnson and Riley counties. This final version of the bill was passed by the legislature, approved by the governor, and is now codified at K.S.A. 2015 Supp. 8-2005(c) and K.S.A. 2015 Supp. 68-526(b).

As previously discussed, K.S.A. 2015 Supp. 8-2005(a) provides "local authorities" with the responsibility for placing and maintaining traffic control devices in their jurisdictions. K.S.A. 2015 Supp. 8-2005(c) now states:

"(c) In townships located in Douglas, Johnson, Riley, Shawnee and Sedgwick counties, the township board shall place and maintain traffic-control devices, other than regulatory signs, on township roads under the board's jurisdiction. In addition, such township board shall place and maintain regulatory signs on township roads under the board's jurisdiction consistent with resolutions of the board of county commissioners of the county in which the township road is located. For this purpose, a regulatory sign is a sign setting forth a regulation, the violation of which subjects the operator of the motor vehicle to fine, imprisonment, or both.

"Nothing in this subsection shall be construed as precluding the board of county commissioners from placing and maintaining traffic-control devices on township roads, if the board determines that traffic-control devices or signs placed by a township are inadequate, but the board of county commissioners shall have no obligation to do so."

K.S.A. 2015 Supp. 68-526(a) addresses the duties of a township board in all counties not operating under the county road unit system, including "the general charge and supervision of all township roads and township culverts in their respective townships." Subsection (b) of the statute now provides:  "In townships located in Douglas, Johnson, Riley, Shawnee and Sedgwick counties, the township board shall place and maintain traffic-control devices and guidance, warning and regulatory signs on all township roads as provided by K.S.A. 8-2005, and amendments thereto." K.S.A. 2015 Supp. 68-526(b).

42

### 5. *District court's ruling*

After reviewing all of the relevant history set forth above, the district court granted summary judgment to the Township, finding that it had no legal statutory duty to place traffic control devices, guidance, or other warnings on its roads. Specifically, the district court noted that the Supreme Court's ruling in *Finkbiner* was predicated upon township authority granted by K.S.A. 8-2005, but the parties and the court in that case had not addressed whether a township met the definition of a "local authority" as defined in K.S.A. 8-1432. The district court held that it did not, as a township lacks authority to adopt ordinances and resolutions to regulate vehicular traffic. See K.S.A. 8-1432. Moreover, the court found that the 2003 amendments to K.S.A. 8-2005 and K.S.A. 68-526 made clear that only townships located in the five designated counties—which did not include Cowley County—have a mandatory duty and authority to place traffic signs on township roads. The court reasoned that if subsection (a) of each of these statutes set forth a mandatory duty on all townships to place traffic control devices on township roads, then the amendments to these statutes would have been unnecessary. Based on its finding that the Township lacked a legal duty to place traffic control devices on its roads, the district court granted summary judgment to the Township.

### B. *Discussion*

As a preliminary matter, Patterson asserts that the district court erred in granting relief to the Township on grounds that it had no duty to place traffic control devices on 322nd Road because the Township did not move for summary judgment on this basis. Since this relief was not requested by the Township, Patterson claims that the issue was not properly before the court. The Township concedes it did not formally raise this issue in a motion for summary judgment. Indeed, the only basis for relief cited in the Township's summary judgment motions was recreational use immunity under the KTCA and the Recreational Use Act.

Contrary to Patterson's argument, however, this issue was properly before the district court. In a pretrial order dated February 20, 2015, the Township alleged, in part, that no part of 322nd Road constituted a township road. In the alternative, the Township alleged that even if the unpaved portion of the road was a township road, the Township was not a local authority as defined by K.S.A. 8-1432 and as clarified by the relevant 2003 statutory amendments. Finally, the Township argued that even if it was a local authority with a duty to place warning signs on the unpaved portion of 322nd Road within the Kaw Wildlife Area, the Township was entitled to recreational use immunity under K.S.A. 2015 Supp. 75-6104(o) and/or K.S.A. 58-3201 *et seq*. The Township later moved for summary judgment solely on grounds that it was entitled to recreational use immunity. Patterson also filed a motion for partial summary judgment, claiming in relevant part that the Township had a legal duty to place traffic control devices on the unpaved portion of 322nd Road. In response, the Township argued that it was not a local authority under K.S.A. 8-1432 and that even if the unpaved portion of 322nd Road was under Township control, it had no legal authority or duty to place traffic control devices on the road pursuant to the relevant 2003 statutory amendments. Patterson then filed a reply brief responding to the Township's arguments. The parties subsequently appeared before the court to argue their respective motions, where they engaged in extensive discussion on the issue of whether the Township had the authority or a legal duty to place traffic control devices on the unpaved portion of 322nd Road.

Patterson asserts that she did not have the opportunity to fully respond to the Township's argument on this issue because it was raised as a defense rather than as an affirmative request for summary judgment. But this issue was clearly presented to the district court and the parties and the court understood the Township's position. It appears that Patterson had ample opportunity to respond to the Township's argument, and she does not otherwise assert what additional information she would have presented or how she would have argued the issue differently had the Township affirmatively raised the

issue in its motion for summary judgment. We find the issue was properly before the district court for decision.

Turning to the merits of Patterson's argument, she claims that the district court's decision is contrary to the Supreme Court's ruling in *Finkbiner* and to legislative intent with respect to counties not operating under the county road unit system. She contends that House Bill 2150 was introduced with the purpose and intent of clarifying that townships in counties not operating within a county road unit system would have the authority and responsibility to maintain traffic control devices on township roads. Patterson asserts that the district court's interpretation of the 2003 statutory amendments is illogical and contrary to this intent because it results in no local authority having the responsibility for maintaining traffic control devices on township roads in the 31 counties not operating under a county road unit system that are not referenced in the 2003 statutory amendments. Patterson argues that the legislature could not have intended this result.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

Patterson's arguments fail for multiple reasons. First, a township is not a "local authority" under K.S.A. 8-1432. K.S.A. 8-1432 defines a local authority as "the Kansas

turnpike authority and every city, county and other local board or body having authority to adopt ordinances or regulations relating to vehicular traffic under the constitution and laws of this state." The plain language of K.S.A. 8-1432 makes clear that a local authority does not include a township. Significantly, none of the statutes relating to a township board provide it with authority to adopt ordinances or regulations relating to vehicular traffic. Rather, their statutory duties are limited to constructing, repairing, and maintaining the physical conditions of township roads. See K.S.A. 2015 Supp. 68-124 (township board has duty to "repair, place and keep in condition for travel" roads and highways located within township); K.S.A. 2015 Supp. 68-526(a) (township board has authority to procure machinery and equipment for construction or repair of township roads and culverts); K.S.A. 2015 Supp. 80-101 (list of township's powers does not include power to adopt ordinances or regulations relating to vehicular traffic). Nor does the Kansas Constitution provide township boards with authority to adopt ordinances or regulations relating to vehicular traffic.

Patterson's reliance on *Finkbiner* to refute this argument is misplaced. Although the *Finkbiner* court cited K.S.A. 8-2005 for the proposition that local authorities are required to place and maintain traffic control devices upon the roads under their jurisdiction as they deem necessary, the parties essentially stipulated that the township was responsible for placing traffic control devices on its roads. 238 Kan. at 860-61. Thus, the issue of whether a township constitutes a local authority as defined in K.S.A. 8-1432 and now referenced in K.S.A. 2015 Supp. 8-2005(a) was not a disputed issue presented to the court for resolution in *Finkbiner*.

Patterson also alleges that the district court's ruling improperly narrows the definition of local authority. Patterson attempts to separate the phrase "other local board" from the phrase "or body having authority to adopt ordinances or regulations relating to vehicular traffic" to argue that a township qualifies as a local board that is not required to have authority to adopt ordinances or regulations relating to vehicular traffic. But courts

46

must construe statutes to avoid unreasonable or absurd results. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778 (2014). Patterson's interpretation of the statute is both unreasonable and absurd because it would provide *any* local board with the power to place and maintain traffic control devices upon highways in their jurisdiction. There are countless local boards in existence that are completely unrelated to traffic regulation. It defies logic and reason to conclude that the legislature intended for *any* local board (school board, hospital board, board of realtors) to have the power to place and maintain traffic control devices on roads and highways. Instead, the language used in K.S.A. 8-1432 makes clear that the legislature intended for this authority to be granted only to those local authorities having the power to adopt ordinances or regulations relating to vehicular traffic. Because a township is not a local authority under K.S.A. 8-1432, it lacks power under K.S.A. 2015 Supp. 8-2005(a) to place traffic control devices on township roads.

This conclusion is further supported by the 2003 amendments to K.S.A. 8-2005 and K.S.A. 68-526, which clearly provide that only townships within the five listed counties have authority to place warning signs on their roads. Patterson argues the legislature could not have intended for no governmental entity to be responsible for placing traffic control devices on township roads in 31 counties. Instead, Patterson urges this court to read K.S.A. 2015 Supp. 8-2005(c) and K.S.A. 2015 Supp. 68-526(b) not as limiting the authority of townships in the 31 counties not mentioned in those statutes but as granting additional authority to townships located within the five counties specifically mentioned, *i.e.*, the authority to place regulatory signs on township roads with the approval of the board of county commissioners.

The problem with Patterson's argument is that it presumes the townships in the unlisted counties had authority to place traffic control devices on their roads prior to the 2003 statutory amendments. As previously stated, this authority did not exist as established by the fact that a township did not constitute a local authority under K.S.A. 8-

47

1432. Notably, the version of House Bill 2150 that was initially proposed by Douglas County gave authority to place and maintain traffic control devices, other than regulatory signs, to all "townships located in counties not operating under the county road unit system." See Minutes, House Transportation Committee, February 20, 2003, attach. 3. The legislature ultimately decided not to adopt this version of the bill and instead amended it to include only five specified counties. The fact that the legislature chose to only list five counties in the statutes indicates its intent to exclude the remaining 31 counties. See *Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003) (applying the canon *expressio unius est exclusion alterius*, *i.e.*, the inclusion of one thing implies the exclusion of another). The legislature had the option to extend these statutory provisions to all townships located in the 36 counties not operating under the county road unit system but chose not to do so after apparent concern that all counties were not aware of the bill and a lack of township representation. The legislature may have been hesitant to place this duty on townships within more rural counties that were not represented at the legislative meetings.

Finally, Patterson contends that the district court's ruling ignores Kansas' adoption of the MUTCD, which places the responsibility for compliance with its provisions directly with the "public agency or official having jurisdiction." See MUTCD § 1A.07.01. Patterson claims the Township is the only appropriate agency with jurisdiction over the relevant portions of 322nd Road. Patterson's attempt to argue that the MUTCD requires townships to place signs on their roads lacks merit. The MUTCD is a traffic engineering manual utilized to create uniformity in the types and locations of traffic control devices nationwide. Patterson provides no authority to support the suggestion that the MUTCD somehow supercedes Kansas statutory law.

The Township is not a local authority as defined in K.S.A. 8-1432 and therefore lacks authority under K.S.A. 2015 Supp. 8-2005(a) to place traffic control devices on its roads. Moreover, the Township is not located within one of the five counties listed in

K.S.A. 2015 Supp. 8-2005(c) and K.S.A. 2015 Supp. 68-526(b) that specifically provides this authority. As a result, the district court properly granted summary judgment to the Township.

CONCLUSION

On the legal issues presented by Patterson and the County for decision in this interlocutory appeal, we conclude that

- the County did not have a duty to initiate an engineering study to determine if the MUTCD required the County to place any additional traffic control devices on the County's portion of 322nd Road;
- the County is immune from liability under the discretionary judgment exception of the KTCA for any failure to place an advisory speed plaque, a Dead End sign, or a No Outlet sign on its portion of 322nd Road;
- the County is not immune from liability under the recreational exception of the KTCA for any failure to place an advisory speed plaque, a Dead End sign, or a No Outlet sign on its portion of 322nd Road;
- the KTCA exception to liability for failing to inspect the property of another does not apply to the facts presented in this case; and
- the Township did not have a duty to place traffic control devices or other warning signs on its portion of 322nd Road.

Affirmed in part, reversed in part, and remanded for proceedings consistent with the findings set forth in this opinion.